# IN THE SUPREME COURT OF CALIFORNIA

IXCHEL PHARMA, LLC,
Plaintiff and Appellant,

v.

BIOGEN, INC.,
Defendant and Respondent.

S256927

Ninth Circuit
18-15258

Eastern District of California
2:17-cv-00715-WBS-EFB

August 3, 2020

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

IXCHEL PHARMA, LLC v. BIOGEN, INC.

S256927

Opinion of the Court by Liu, J.

This case presents two questions about the bounds of legitimate business competition under California tort and antitrust law. Plaintiff Ixchel Pharma, LLC (Ixchel), a biotechnology company, entered into an agreement with Forward Pharma (Forward) to jointly develop a drug for the treatment of a disorder called Friedreich's ataxia. The drug development went according to plan until Forward decided to withdraw from the agreement, as was allowed by its terms. Pursuant to a settlement with another biotechnology company, defendant Biogen, Inc. (Biogen), Forward had agreed to terminate its contract with Ixchel.

Ixchel sued Biogen in federal court for tortiously interfering with Ixchel's contractual and prospective economic relationship with Forward and claimed that Biogen did so in violation of Business and Professions Code section 16600. On appeal, the United States Court of Appeals for the Ninth Circuit asked us to decide (1) whether Biogen's interference in Ixchel's at-will contract with Forward must be independently wrongful and (2) how Business and Professions Code section 16600 applies to the settlement provision requiring Forward to terminate its agreement with Ixchel.

We hold that tortious interference with at-will contracts requires independent wrongfulness and that a rule of reason

applies to determine the validity of the settlement provision under Business and Professions Code section 16600.

## I.

Because this case comes to us from the Ninth Circuit at the motion to dismiss stage, we assume the truth of the facts as alleged in Ixchel's operative complaint. (*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 629.) Ixchel is a biotechnology company that develops drugs to treat mitochondrial disease. Since 2012, it has been developing a drug containing the active ingredient dimethyl fumarate (DMF) to treat Friedreich's ataxia, a neurodegenerative disorder affecting one in 50,000 Americans.

Because Ixchel did not have the resources to develop the drug by itself, in 2016 it entered into a Collaboration Agreement with Forward, a biotechnology company that also develops drugs containing DMF for the treatment of neurological diseases. Under the terms of the Collaboration Agreement, Ixchel agreed to assign certain patent rights it possessed to Forward. In return, Forward agreed to work with Ixchel to develop a new drug containing DMF to treat Friedreich's ataxia. Forward would investigate the feasibility of conducting clinical trials for the drug and, if feasible, would conduct those trials and pay for them. Ixchel would provide assistance with the clinical trials as necessary. If the clinical trials were successful, Forward agreed to manage and pay for the manufacturing and commercialization of the drug with the assistance of Ixchel. Ixchel was entitled to a percentage of royalties on sales of the drug and retained certain rights to engage in its own commercialization of the drug independent of Forward.

The Collaboration Agreement authorized Forward to terminate the agreement "at any time" so long as it provided notice to Ixchel 60 days in advance. Ixchel was authorized to terminate the agreement if Forward informed Ixchel that it would not conduct clinical trials of the new drug or if it would not or did not timely submit a new drug application for the developed drug to the Food and Drug Administration. In October 2016, Forward informed Ixchel that it had confirmed the feasibility of conducting clinical trials and would proceed to conduct those trials. Thereafter, Ixchel and Forward began to develop a plan for a trial study.

At the same time that Forward and Ixchel were working together, Forward was negotiating with Biogen, another biotechnology company, to settle a patent dispute related to the use of DMF for the treatment of multiple sclerosis. One of Biogen's drugs, Tecfidera, is used to treat multiple sclerosis and contains DMF as an active ingredient. Ixchel alleges that because physicians can prescribe a drug containing DMF to treat conditions that the drug was not approved to treat, Ixchel's drug development poses a competitive threat to Biogen's Tecfidera drug.

As a result of negotiations, Forward and Biogen entered into a settlement and license agreement (Forward-Biogen Agreement) in which Biogen agreed to pay Forward $1.25 billion in exchange for a license to certain Forward patents and other intellectual property. In addition, section 2.13 of the Forward-Biogen Agreement required Forward to "terminate any and all existing, and not enter into any new, Contracts or obligations to Ixchel Pharma LLC . . . and/or any other Person, to the extent related to the development [by Forward and its affiliate companies] of any pharmaceutical product having *dimethyl*

*fumarate* as an [active ingredient] for the treatment of a human for any indication, including Friedreich's ataxia." Because Forward's only business is the development of drugs containing DMF as an active ingredient to treat humans, Ixchel alleges that the Forward-Biogen Agreement effectively prohibited Forward from engaging in its entire business or a substantial part of it.

Forward notified Ixchel that because it had entered into the Forward-Biogen Agreement, it would be terminating the Collaboration Agreement with Ixchel in 60 days. After Forward terminated the agreement, Ixchel lost its ability to develop its Friedreich's ataxia treatment and has been unable to find another development partner to do so.

Ixchel filed suit against Biogen in federal district court, asserting (1) violations of the federal and state antitrust laws (15 U.S.C. § 1; Bus. & Prof. Code, § 16700 et seq.), (2) tortious interference with contractual relations, (3) intentional and negligent interference with prospective economic advantage, and (4) violations of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.). (All undesignated references are to the Business and Professions Code.)

The district court granted Biogen's motion to dismiss with respect to each of Ixchel's claims. (*Ixchel Pharma, LLC v. Biogen Inc.* (E.D.Cal., Sept. 12, 2017, No. 2:17-cv-00715-WBS-EFB) 2017 WL 4012337.) It determined that Ixchel had failed to state a claim for interference with prospective economic advantage or interference with contractual relations because Ixchel did not plead that Biogen engaged in an independently wrongful act. (*Id*. at p. *5.) The district court acknowledged that tortious interference with contract claims do not generally require independent wrongfulness, but it held that because the contract

at issue was one terminable at will, independent wrongfulness was required. (*Id.* at p. *4.) The district court also dismissed Ixchel's federal and state antitrust claims for lack of antitrust standing. (*Id.* at p. *3.) Finally, because Ixchel's other claims had been dismissed, the district court dismissed Ixchel's UCL claim for failing to allege an actionable unlawful practice. (*Id.* at pp. *5–*6.)

Ixchel then filed a second amended complaint, the operative complaint in this case, to allege that Biogen had committed the wrongful act of violating section 16600's prohibition against restraints of trade. Ixchel claimed that by agreeing to section 2.13 of the Forward-Biogen Agreement, Biogen restrained Forward from engaging in lawful business with Ixchel and any other entity to develop neurological treatments containing DMF.

The district court disagreed and again dismissed the complaint, this time on the grounds that the Forward-Biogen Agreement must be analyzed under the antitrust rule of reason and that section 16600 does not apply outside the employment context. (*Ixchel Pharma, LLC v. Biogen Inc.* (E.D.Cal., Jan. 25, 2018, No. 2:17-cv-00715-WBS-EFB) 2018 WL 558781, p. *4.)

Ixchel sought review of its tort and UCL claims. After oral argument, the Ninth Circuit certified two questions to this court: (1) "Does section 16600 of the California Business and Professions Code void a contract by which a business is restrained from engaging in a lawful trade or business with another business?" (2) "Is a plaintiff required to plead an independently wrongful act in order to state a claim for intentional interference with a contract that can be terminated by a party at any time, or does that requirement apply only to

at-will employment contracts?" (*Ixchel Pharma, LLC v. Biogen, Inc.* (9th Cir. 2019) 930 F.3d 1031, 1033 (*Ixchel*)).)

We rephrase and reorder the questions as follows (see Cal. Rules of Court, rule 8.548(f)(5)): (1) Is a plaintiff required to plead an independently wrongful act in order to state a claim for tortious interference with a contract that is terminable at will? (2) What is the proper standard to determine whether section 16600 voids a contract by which a business is restrained from engaging in a lawful trade or business with another business? The questions are related; the alleged violation of section 16600 is the independently wrongful act in Ixchel's contractual interference claim.

## II.

We first address Ixchel's claim that Biogen tortiously interfered in Ixchel's contract with Forward. Before this court, neither party contests that the Cooperation Agreement is a valid contract that Forward was entitled to terminate at will. Nor is it at issue whether Forward terminated the agreement according to its terms by giving Ixchel notice 60 days prior to termination. The only question before us is whether Ixchel must allege that Biogen committed an independently wrongful act in order to state a claim for tortious interference with contract in light of the fact that the Cooperation Agreement is an at-will contract.

### A.

California has traditionally recognized two economic relations torts: interference with the performance of a contract (*Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 35 (*Imperial Ice*)) and interference with a prospective economic relationship (*Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 822 (*Buckaloo*)).

"[B]oth of these torts protect the public interest in stable economic relationships . . . ." (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1152 (*Reeves*).)

The two torts are related but distinct. Tortious interference with contractual relations requires "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Reeves*, *supra*, 33 Cal.4th at p. 1148; see *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 (*Pacific Gas*).) It is generally not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55 (*Quelimane*).) This general rule is subject to certain exceptions discussed below.

Tortious interference with prospective economic advantage, on the other hand, does not depend on the existence of a legally binding contract. A plaintiff asserting this tort must show that the defendant knowingly interfered with an " ' "economic relationship between the plaintiff and some third party, [which carries] the probability of future economic benefit to the plaintiff." ' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 (*Korea Supply*).)

Before our decision in *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 (*Della Penna*), we treated interference with contractual relations and interference with prospective economic advantage as two species of the same tort. (See *Buckaloo*, *supra*, 14 Cal.3d at p. 823.) Each tort contained

the same elements with the exception that interference with contractual relations required the existence of a binding contract. (Compare *id.* at p. 827 [elements of interference with prospective economic advantage] with *Pacific Gas, supra*, 50 Cal.3d at p. 1126 [elements of interference with contractual relations].) The primary difference between the two torts was that the range of acceptable justifications — that is, affirmative defenses — was broader when a defendant interfered with an unconsummated prospective economic relationship. (*Pacific Gas*, at p. 1126; *Environmental Planning & Information Council v. Superior Court* (1984) 36 Cal.3d 188, 194 (*EPIC*); *Buckaloo*, at p. 828.) "[A] competitor's stake in advancing his own economic interest will not justify the intentional inducement of a contract breach [citation], whereas such interests will suffice where contractual relations are merely contemplated or potential." (*EPIC*, at p. 194.)

That changed in *Della Penna*, when we "dr[e]w and enforce[d] a sharpened distinction between claims for the tortious disruption of an *existing* contract and claims that a *prospective* contractual or economic relationship has been interfered with." (*Della Penna, supra*, 11 Cal.4th at p. 392.) We held that a plaintiff seeking to recover damages for interference with prospective economic advantage must plead as an element of the claim that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." (*Id.* at p. 393.) We reasoned that "courts provide a damage remedy against third party conduct intended to disrupt an existing contract precisely because the exchange of promises resulting in such a formally cemented economic relationship is deemed worthy of protection from interference by a stranger to the agreement. Economic relationships short of contractual,

however, should stand on a different legal footing as far as the potential for tort liability is reckoned. Because ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." (*Id.* at p. 392.) Concerned that the old rule led "to time consuming and expensive lawsuits . . . by a rival, based on conduct that was regarded by the commercial world as both commonplace and appropriate" (*id.* at p. 384), we found it important to afford "greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant" (*id.* at p. 392). Imposing an independent wrongfulness requirement at the pleading stage thus struck a "balance between providing a remedy for predatory economic behavior and keeping legitimate business competition outside litigative bounds." (*Id.* at p. 378.)

Our decisions since *Della Penna* have reaffirmed the distinction between the two torts. (See *Quelimane, supra*, 19 Cal.4th at pp. 55–56; *Korea Supply, supra*, 29 Cal.4th at p. 1158.) So, while intentionally interfering with an existing contract is generally "a wrong in and of itself" (*Quelimane*, at p. 56), intentionally interfering with prospective economic advantage requires pleading that the defendant committed an independently wrongful act (*Korea Supply*, at p. 1158). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Id.* at p. 1159.)

**B.**

With that framework in mind, we consider whether stating a claim for interference with an at-will contract requires pleading an independently wrongful act. We have long recognized that interference with at-will contracts is actionable as an economic tort. (*Pacific Gas*, *supra*, 50 Cal.3d at p. 1127 [citing cases]; accord, *Truax v. Raich* (1915) 239 U.S. 33, 38 [recognizing that the weight of authority considers a third party's unjustified interference with an employment-at-will contract actionable].) "[T]he fact that a contract is 'at the will of the parties, respectively does not make it one at the will of others . . . .'" (*Speegle v. Board of Fire Underwriters of the Pacific* (1946) 29 Cal.2d 34, 39 (*Speegle*).)

But we have not decided whether interference with an at-will contract more closely resembles interference with contractual relations or interference with prospective economic advantage. That is because the distinction was not important for the many decades when the two interference torts contained basically the same elements. Ixchel argues that we settled the question in *Pacific Gas*, *supra*, 50 Cal.3d 1118, a case decided five years before *Della Penna* distinguished the two torts. According to Ixchel, *Pacific Gas* set "the default rule that, for an intentional interference with contract claim, there is no requirement of an independently wrongful act, even where the alleged misconduct is inducing a party to terminate an at-will contract." We disagree.

In that case, the Pacific Gas and Electric Company sued Bear Stearns for interfering in the utility's contract to purchase hydroelectric power from a water resource agency and for interfering with the utility's prospective economic relations.

(*Pacific Gas*, *supra,* 50 Cal.3d at pp. 1123–1124.) The contract at issue allowed the water resource agency to terminate the agreement at the end of the year in which the agency retired all of its project bonds. Bear Stearns convinced the agency to seek a determination in state court that it could terminate the contract by retiring its project bonds early. (*Ibid.*) We held that merely inducing a contracting party to seek a judicial determination whether it can terminate a contract according to its terms is not sufficient to state a claim under either economic tort. (*Id.* at p. 1137.) We outlined the elements of a contract interference claim for the first time and did not require that the interference be independently wrongful. (*Id.* at p. 1126.) Separately, we explained that interference with an at-will contract has long been actionable. (*Id.* at p. 1127.)

Critically, we acknowledged that "[m]any cases have treated claims of interference with voidable and terminable contracts as coming within the cause of action for interference with prospective advantage. [Citations.] . . . [I]t may be preferable not to distinguish the two as separate torts [citation] but we need not resolve that point here, in view of our conclusion that the activity complained of is not included within either tort." (*Pacific Gas*, *supra*, 50 Cal.3d at p. 1128, fn. 4.) Thus, contrary to Ixchel's argument, *Pacific Gas* expressly reserved the question of whether interference with an at-will contract should be treated as a claim of interference with contractual relations or as a claim of interference with prospective economic advantage. Because the alleged misconduct in that case did not constitute interference with any economic relationship, contractual or otherwise, it was unnecessary to resolve the question.

It was also unnecessary to resolve the question because, as explained, the elements of both torts were largely the same at that time. We had yet to differentiate the two torts in *Della Penna* by requiring an independent wrongfulness element for interference with prospective economic advantage. There was thus no occasion to address whether interference with an at-will contract required pleading an independently wrongful act since it was not then a requirement for either tort. (Cf. *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 880, fn. 9 [cases decided before *Della Penna* are not relevant to determining whether interference with an unenforceable contract constitutes interference with contractual relations or interference with prospective economic advantage].) So, *Pacific Gas* did not answer the question now before us.

Fourteen years later in *Reeves*, *supra*, 33 Cal.4th 1140, we resolved part of the question *Pacific Gas* left open. *Reeves* held that a plaintiff must plead independent wrongfulness to state a claim for interference with a specific category of at-will contracts: employment contracts. (*Reeves*, at p. 1145.) That holding was based on two rationales. First, California's public policy favoring employment competition supported such a rule. We observed that "it has long been the public policy of our state that '[a] former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of . . . his former employer, provided such competition is fairly and legally conducted.' " (*Id*. at p. 1149.) Our previous decisions indicated that "[w]here no unlawful methods are used, public policy generally supports a competitor's right to offer more pay or better terms to another's employee, so long as the employee is

free to leave." (*Id.* at p. 1151; see also *id.* at p. 1145 [observing that the independent wrongfulness requirement "will promote the public policies supporting the right of at-will employees to pursue opportunities for economic betterment and the right of employers to compete for talented workers"].)

Second, we reasoned that "the economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts." (*Reeves*, *supra*, 33 Cal.4th at p. 1151.) We explained that interference with other legally binding contracts, such as contracts of a definite term, is tortious " 'because the exchange of promises resulting in such a formally cemented economic relationship is deemed worthy of protection from interference by a stranger to the agreement.' " (*Ibid.*, quoting *Della Penna*, *supra*, 11 Cal.4th at p. 392.) But at-will contracts do not involve the same "cemented economic relationship[s]" as contracts of a definite term. (*Della Penna*, at p. 392.) Quoting the Restatement Second of Torts, we explained that " 'any interference with [an at-will contract] that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them. As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by the choice of [a contracting party] there is no breach of it. The competitor is therefore free, for his own competitive advantage, to obtain the future benefits for himself by causing the termination. Thus, he may offer better contract terms, as by offering an employee of the plaintiff more money to work for him or by offering a seller higher prices for goods, and he may make use of persuasion or other suitable means, all without liability.' "

(*Reeves*, at pp. 1151–1152, first bracketed insertion added, quoting Rest.2d Torts, § 768, com. i.)

Ixchel argues that we should limit *Reeves* to the employment context. It cites the employment-specific policy concerns animating *Reeves* as well as appellate decisions that have limited *Reeves*'s holding to suits involving a former employer suing a competitor for hiring away a former employee. (See *Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 1003; *Popescu v. Apple Inc.* (2016) 1 Cal.App.5th 39, 62.) Biogen contends that the rationale in *Reeves* applies beyond the employment context to intentional interference with contract whenever a "defendant induces a new partner to terminate an at-will agreement."

It is true that our holding in *Reeves* relied partly on reasoning specific to the employment context. But the broader logic underlying that decision is persuasive with respect to other spheres of economic relations. The Restatement's rationale on which *Reeves* relied is not limited to employment relationships. The Restatement explains: "One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations. [Citation.] If the defendant was a competitor regarding the business involved in the contract, his interference with the contract may be not improper." (Rest.2d Torts, § 766, com. g; accord, *id.*, § 768, com. i.)

A number of states have adopted this section of the Restatement to require proof of independent wrongfulness in a claim for interference with at-will contractual relations. (See

*Nostrame v. Santiago* (2013) 213 N.J. 109, 121; *Macklin v. Robert Logan Associates* (1994) 334 Md. 287, 304; *Duggin v. Adams* (1987) 234 Va. 221, 226–227; *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.* (Colo. 1984) 690 P.2d 207, 211; *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.* (1980) 50 N.Y.2d 183, 191.) We have often aligned the elements of both economic relations torts with the Restatement (see *Korea Supply*, *supra*, 29 Cal.4th at p. 1156 [intentional interference with contract does not contain a specific intent requirement]; *Quelimane*, *supra*, 19 Cal.4th at p. 56 [interference with prospective economic advantage does not contain a specific intent requirement]; *Della Penna*, *supra*, 11 Cal.4th at p. 378 [interference with prospective economic advantage requires proof of a " 'wrongful act' "]), and we find the Restatement persuasive here as well.

The purpose of the independent wrongfulness requirement in economic interference torts is to "balance between providing a remedy for predatory economic behavior and keeping legitimate business competition outside litigative bounds." (*Della Penna*, *supra*, 11 Cal.4th at p. 378; see *Buckaloo*, *supra*, 14 Cal.3d at p. 828; *Imperial Ice*, *supra*, 18 Cal.2d at p. 36.) Where economic relationships have solidified into binding future promises, the stability of the contractual relationship takes precedence over business competition. While "[o]urs is a competitive economy in which business entities vie for economic advantage" (*Buckaloo*, at p. 828), that competition must at some point result in entities making agreements and exchanging things of value. When parties enter a contract not terminable at will, they cement their bargained-for intentions in accordance with the terms of that contract into the future. The concreteness of this relationship means that contracting parties

as well as other entities may structure their decisions, invest resources, and take risks in reliance on it. It is precisely this "exchange of promises resulting in such a formally cemented economic relationship [that courts have] deemed worthy of protection from interference by a stranger to the agreement." (*Della Penna*, at p. 392.) "Intentionally inducing or causing a breach of an existing contract is therefore a wrong in and of itself." (*Quelimane, supra*, 19 Cal.4th at pp. 55–56.)

The same balance of interests does not apply to prospective economic relationships. Such relationships are only "probable" (*Korea Supply, supra*, 29 Cal.4th at p. 1164), and harms resulting from a breach of such relationships are "speculative" (*Quelimane, supra*, 19 Cal.4th at p. 56). Neither party to such a relationship has a legal claim to continued relations with the other. Because the expectation of future relations is weaker and the interest in maintaining open competition is stronger, "the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." (*Della Penna, supra*, 11 Cal.4th at p. 392.) In circumstances where parties have no legal assurance of future relations, "the rewards and risks of competition are dominant." (*Ibid.*)

Like parties to a prospective economic relationship, parties to at-will contracts have no legal assurance of future economic relations. (See *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1053 [at-will contracts provide "only an expectation of future contractual relations"].) An at-will contract may be terminated, by its terms, at the prerogative of a single party, whether it is because that party found a better offer from a competitor, because the party decided not to continue doing business, or for some other reason. And the other

party has no legal claim to the continuation of the relationship. The contracting parties presumably bargained for these terms, aware of the risk that the relationship may be terminated at any time. At-will contractual relations are thus not cemented in the way that a contract not terminable at will is. The interest in protecting the contract from interference more closely resembles the interest in protecting prospective economic relationships than the interest in protecting a contractual relationship that, by its terms, is expected to continue on pain of breach.

Indeed, sometimes the only difference between an at-will contract and a prospective economic relationship is the formality of how a contractual relationship is structured. For example, a buyer who regularly renews a one-time contract to purchase goods has a prospective economic relationship with the vendor with respect to future purchases of those goods. (See *Shida v. Japan Food Corp.* (1967) 251 Cal.App.2d 864, 866 [interference with yearly renewal of contract treated as interference with prospective economic advantage].) But that same buyer would have an at-will contractual relationship if it entered into a single contract with the vendor to provide those goods at regular intervals terminable at the buyer's will. In both, the vendor has no legal assurance of the buyer's continued purchases.

We recognize that in an at-will contract, the parties' expectations are of continuity unless one party terminates the contract, whereas the expectations of a continued relationship are more speculative where no contract exists. But from the perspective of third parties, there is no legal basis in either case to expect the continuity of the relationship or to make decisions in reliance on the relationship. We are not convinced that any difference in expectations between the parties requires a different pleading standard between interference with

prospective economic advantage and interference with at-will contractual relations.

Finally, allowing interference with at-will contract claims without requiring independent wrongfulness risks chilling legitimate business competition. An actionable claim for interference with contractual relations does not require that the defendant have the specific intent to interfere with a contract. A plaintiff states a claim so long as it alleges that the defendant knew interference was " 'certain or substantially certain to occur as a result of [defendant's] action.' " (*Quelimane*, *supra*, 19 Cal.4th at p. 56.) Without an independent wrongfulness requirement, a competitor's good faith offer that causes a business to withdraw from an at-will contract could trigger liability or at least subject the competitor to costly litigation. In fact, even if a business in an at-will contract solicits offers on its own initiative, a third party that submits an offer could face liability if it knew that acceptance of the offer would cause the soliciting business to withdraw from its existing contract. Allowing disappointed competitors to state claims for interference with at-will contracts without alleging independently wrongful conduct may expose routine and legitimate business competition to litigation.

We therefore hold that to state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act. We disapprove *Redfearn v. Trader Joe's Co.*, *supra*, 20 Cal.App.5th 989 and *Popescu v. Apple Inc.*, *supra*, 1 Cal.App.5th 39 to the extent they are inconsistent with this opinion.

## III.

Ixchel alleges that the wrongful act Biogen committed was including section 2.13 in the Forward-Biogen Agreement in violation of Business and Professions Code section 16600. Section 2.13 of the Forward-Biogen Agreement required Forward to terminate its Collaboration Agreement with Ixchel and barred Forward from engaging in business with any other entity to develop neurological treatments containing DMF. Ixchel claims that this contractual provision is an unlawful restraint of trade in violation of section 16600, which provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

The Ninth Circuit certified the following question to us: "Does section 16600 of the California Business and Professions Code void a contract by which a business is restrained from engaging in a lawful trade or business with another business?" (*Ixchel*, *supra*, 930 F.3d at p. 1033.) That question appears to ask this court to decide whether section 16600 applies to contracts in the business context. The Ninth Circuit suggested that "the California Supreme Court . . . [has not] considered whether section 16600 extends beyond the employment setting entirely to contractual restraints on business operations." (*Ixchel*, at p. 1036.)

Ixchel asks us to decide that question only. But the primary dispute between Ixchel and Biogen in the Ninth Circuit was not whether section 16600 applies to business contracts. At oral argument in the Ninth Circuit, Biogen acknowledged that it does. Instead, the dispute was whether contractual restraints on business operations or commercial dealings are subject to a

19

reasonableness standard under section 16600. Moreover, the proper standard governing alleged restraints of trade under section 16600 presents an important question of California law, potentially affecting all contracts in California that in some way restrain a contracting party from engaging in a profession, trade, or business.

To provide the Ninth Circuit sufficient guidance to resolve the contentions of the parties and to answer an important question of California law, we address not only whether section 16600 applies to contracts in the business context (the parties agree that it does) but also the proper standard — in particular, whether a rule of reason applies — to evaluate whether restraints on trade in business contracts are void under section 16600. (See Cal. Rules of Court, rule 8.548(f)(5); *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 317, fn. 1 [restating certified question "to conform to the facts at issue in the underlying action"].)

Ixchel argues that deciding this question is premature because the case is at the pleading stage and the parties have not had the opportunity to discover facts that would show whether section 2.13 of the Forward-Biogen Agreement was unreasonable. But in deciding whether section 16600 includes a reasonableness requirement in the context of business contracts, we are deciding a pure question of law. The question at this stage is whether Ixchel must plead and prove unreasonableness, not whether it has actually done so. Whether the parties have put forth facts demonstrating unreasonableness is immaterial to the antecedent question of whether a reasonableness requirement applies here.

### A.

As an initial matter, we agree with the parties that section 16600 applies to business contracts. The chapter of the Business and Professions Code containing section 16600 excepts from section 16600's coverage certain noncompetition agreements upon the sale of goodwill or of ownership interest in a business (§ 16601) and upon the dissolution or dissociation from a partnership (§ 16602) or limited liability corporation (§ 16602.5). If section 16600 did not apply to business contracts, these exceptions would be unnecessary. Indeed, California courts have frequently analyzed whether contracts involving business dealings are void under section 16600. (See, e.g., *Centeno v. Roseville Community Hospital* (1979) 107 Cal.App.3d 62, 68 (*Centeno*); *Dayton Time Lock Service, Inc. v. Silent Watchman Corp.* (1975) 52 Cal.App.3d 1, 6 (*Dayton Time Lock*); *Great Western Distillery Products v. John A. Wathen Distillery Co.* (1937) 10 Cal.2d 442, 445–446 (*Great Western Distillery*) [applying Civ. Code, former § 1673, the predecessor statute to Bus. & Prof. Code, § 16600]; *Getz Bros. & Co. v. Federal Salt Co.* (1905) 147 Cal. 115, 118–119 (*Getz Brothers*) [same].)

The parties do not contend that any of the exceptions to section 16600 apply here. Instead, they disagree on the applicable standard to examine the validity of section 2.13 of the Forward-Biogen Agreement under section 16600. Biogen argues that the rule of reason used to analyze antitrust violations under the Cartwright Act (§ 16700 et seq.) should also govern restraints on business dealings under section 16600. That inquiry asks "whether an agreement harms competition more than it helps" by considering " 'the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the

reasons for its adoption.' " (*In re Cipro Cases I & II* (2015) 61 Cal.4th 116, 146 (*Cipro*).)  Ixchel counters that section 16600 is not subject to a reasonableness standard; it urges the court to extend *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937 (*Edwards*) and hold that any contract in restraint of trade is per se void.

The language of section 16600 is broad on its face:  "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  Read in isolation, the text suggests that any part of an agreement restraining a party from engaging in a trade, profession, or business is per se invalid unless certain exceptions apply.  But in reading statutes, we consider the text in the context of "the statutory framework as a whole in order to determine its scope and purpose." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)  And we must consider the statute in light of precedent construing it.  (See *Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 676.)

In context, section 16600 is best read not to render void per se all contractual restraints on business dealings, but rather to subject such restraints to a rule of reason.  Section 16600 was initially enacted in 1872 as section 1673 of the Civil Code using substantively identical language.  (Civ. Code, former § 1673, repealed by Stats. 1941, ch. 526, § 2, p. 1847 and enacted as Bus. & Prof. Code, § 16600 by Stats. 1941, ch. 526, § 1, p. 1834.)  Our decisions interpreting Civil Code former section 1673 thus inform the interpretation of section 16600.  (See *People v. Bonnetta* (2009) 46 Cal.4th 143, 151 ["[W]hen a statute has been construed by the courts and the Legislature thereafter reenacts the statute without changing the interpreted language, a

presumption is raised that the Legislature was aware of and has acquiesced in that construction."].) And Civil Code former section 1673 was enacted against the backdrop of well-established common law prohibitions against restraints of trade. (See *Vulcan Powder Co. v. Hercules Powder Co.* (1892) 96 Cal. 510, 513 (*Vulcan Powder*).) As explained below, this court has interpreted section 16600 and its Civil Code predecessor on numerous occasions, and we have declined to categorically invalidate all agreements limiting the freedom to engage in trade. Over time, our case law has generally invalidated agreements not to compete upon the termination of employment or upon the sale of interest in a business without inquiring into their reasonableness, while invalidating other contractual restraints on businesses operations and commercial dealings only if such restraints were unreasonable.

We must also consider section 16600's "language in its 'broader statutory context' and, where possible, harmonize that language with related provisions by interpreting them in a consistent fashion." (*ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 189 (*ZB*).) Section 16600 sits alongside another antitrust statute, the Cartwright Act (§ 16700 et seq.), which we have construed to permit reasonable restraints of trade. (*Cipro*, *supra*, 61 Cal.4th at p. 137.) This statutory context further supports the conclusion that a rule of reason applies to contractual restraints on business operations and commercial dealings under section 16600.

## B.

We turn first to the statute's history and our precedent. "Under the common law, . . . contractual restraints on the practice of a profession, business, or trade, were considered

valid, as long as they were reasonably imposed." (*Edwards*, *supra*, 44 Cal.4th at p. 945; accord, *Wright v. Ryder* (1868) 36 Cal. 342, 357 (*Wright*).) As noted, the Legislature in 1872 adopted Civil Code former section 1673, which provided: "Every contract by which any one is restrained from exercising a lawful profession, trade, or business of any kind, otherwise than is provided by the next two sections, is to that extent void." The next two sections excepted certain contractual restraints upon the sale of goodwill in a business (Civ. Code, former § 1674) or upon dissolution of a partnership (Civ. Code, former § 1675).

The Code Commissioners' note stated that Civil Code former section 1673 was enacted in response to certain "modern decisions" that allowed contractual restraints to a "dangerous extent." (Code commrs., note foll. 1 Ann. Civ. Code, § 1673 (1st ed. 1872, Haymond & Burch, commrs.-annotators) p. 502 (Commissioners' Note).) Specifically, it disapproved of two cases upholding agreements not to compete in the operation of boats. (*Id.* at pp. 502–503, citing *Dunlop v. Gregory* (1851) 10 N.Y. 241, *California Steam Nav. Co. v. Wright* (1856) 6 Cal. 258.) But the Commissioners' Note did not go so far as to say that Civil Code former section 1673 categorically replaced the common law standard of reasonableness with a per se rule. In fact, the note stated that the statute's limitation on contractual restraints was consistent with two decisions adopting the common law reasonableness standard. (Commissioners' Note, at p. 503, citing *Wright*, *supra*, 36 Cal. 342, *More v. Bonnet* (1870) 40 Cal. 251 (*More*).) And one of those decisions expressly upheld a noncompetition agreement "because the limits [were] not unreasonable." (*More*, at p. 254.) Thus, the Commissioners' Note suggests that Civil Code former section 1673, in prohibiting agreements that restrained trade to a "dangerous

extent," was not intended to invalidate all restraints on trade. (Commissioners' Note, at p. 502; see *People v. Chun* (2009) 45 Cal.4th 1172, 1187 [Commissioners' notes are "entitled to substantial weight"].)

Nor did this court's decisions interpreting Civil Code former section 1673 adopt a per se rule invalidating all contracts that limit business dealings. Our cases initially offered little clarity on the appropriate standard to evaluate agreements restraining trade. In our first reasoned opinion interpreting the statute, we invalidated an agreement between manufacturers of dynamite to fix prices and limit output. (*Vulcan Powder, supra*, 96 Cal. at pp. 514–515.) We noted that the common law rule of reason "led to much perplexing legislation" and had been replaced by Civil Code former section 1673, but we did not explain what standard the new statute imposed. (*Vulcan Powder*, at p. 513.) We simply said that the agreement at issue was "clearly in restraint of trade and against public policy; and this conclusion is too obvious to need argument, authorities, or elucidation." (*Id.* at p. 515.) Our reasoning did not explain whether we found the agreement per se invalid or invalid by some other standard. (See also *Schwalm v. Holmes* (1875) 49 Cal. 665, 669 [holding that exclusive sales contract was "not illegal, as being in restraint of trade" in two-sentence disposition without further analysis].)

Over time, however, two discernible categories of holdings emerged in our case law: Agreements not to compete after the termination of employment or the sale of interest in a business were invalid without regard to their reasonableness. And agreements limiting commercial dealings and business operations were generally invalid if they were unreasonable.

As to agreements not to compete after termination of employment or the sale of interest in a business, an early case was *Merchants' Ad-Sign Co. v. Sterling* (1899) 124 Cal. 429 (*Merchants' Ad-Sign*), which invalidated an agreement not to compete as part of the sale of stock in an advertising company. (*Id.* at p. 434.) Our reasoning in that case rested on the plain language of the statute, and we did not examine whether the restraint was reasonable. We emphasized that "[t]he language of the code is unmistakable" and rejected the applicability of cases adopting a more "liberal construction" of the statute. (*Ibid.*) Because the noncompetition agreement prevented one party from engaging in the business of bill posting after he sold his interest in the advertising business to the other party, it violated the plain language of Civil Code former section 1673 and was therefore void. (*Merchants Ad-Sign*, at p. 434.)

Likewise, in *Chamberlain v. Augustine* (1916) 172 Cal. 285 (*Chamberlain*), we invalidated an agreement imposing a financial penalty for competition, which was included as part of the sale of stock in a foundry company. (*Id.* at p. 288.) The $5,000 penalty was a sufficient deterrent to competition to constitute a restraint of trade under Civil Code former section 1673. Pointing to "the very language of [former] section 1673," we determined that "[t]he statute makes no exception in favor of contracts only in partial restraint of trade." (*Chamberlain*, at pp. 288, 289; accord, *Gregory v. Spieker* (1895) 110 Cal. 150, 154 [agreement not to compete in a particular county as part of the sale of a liquor business "transgressed the statute"].)

It is true that these decisions spoke in broad terms, suggesting that restraints on trade in all contexts were void per se. (*See Merchants' Ad-Sign*, *supra*, 124 Cal. at p. 434 ["[t]he language of the code is unmistakable"]; *Chamberlain*, *supra*,

172 Cal. at pp. 288–289 ["the very language of [former] section 1673 . . . makes no exception in favor of contracts only in partial restraint of trade"].) But "[i]t is axiomatic that an unnecessarily broad holding is 'informed and limited by the fact[s]' of the case in which it is articulated." (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 790, fn. 11; see *People v. Mendoza* (2000) 23 Cal.4th 896, 915 [" 'we must view with caution seemingly categorical directives not essential to earlier decisions' "].) The contracts at issue in these cases involved agreements not to compete upon terminating employment or selling a business, and we understand their holdings to be informed and limited by the factual context presented.

By contrast, we did not interpret Civil Code former section 1673 so literally with regard to contractual restraints on business operations and commercial dealings. We generally declared agreements in this context valid if the restraints they imposed were reasonable. In *Grogan v. Chaffee* (1909) 156 Cal. 611 (*Grogan*), we upheld a contract between a manufacturer and purchaser of olive oil requiring the purchaser to resell the product at a certain price. We interpreted Civil Code former section 1673 to contain a reasonableness requirement: "It is not every limitation on absolute freedom of dealing that is prohibited. . . . 'The question is whether, under the particular circumstances of the case, and the nature of the particular contract involved in it, the contract is, or is not, unreasonable.' . . . [I]t must be taken to be settled that the sections of the Civil Code, [former] sections 1673, 1674, 1675, relating to contracts in restraint of trade are to be construed in the light of these principles." (*Grogan,* at p. 615.) The agreement, we concluded, was a reasonable restraint because its purpose was not to create a monopoly but to "secur[e] the

legitimate benefits of the reputation which [the manufacturer's] product may have attained." (*Id.* at p. 614.)

Similarly, in *Associated Oil Co. v. Myers* (1933) 217 Cal. 297 (*Associated Oil*), we upheld a contract between the lessor of an automobile service station and a lessee of the station, which included an agreement that the lessor would only sell the lessee's petroleum products. Citing the reasonableness standard in *Grogan*, we concluded that the lessee "had the right to decline to sell any but its own product upon the leased property. We can see nothing unreasonable in requiring the [lessor] to do the same thing. The public interest is not involved and competition is not stifled. In no way does the agreement attempt to limit production or fix the price of the commodity involved." (*Associated Oil*, at p. 306.)

Some of our cases invalidating contractual restraints in the business context did not expressly apply a reasonableness standard. (See *Morey v. Paladini* (1922) 187 Cal. 727 (*Morey*); *Pacific Wharf & Storage Co. v. Standard Am. Dredging Co.* (1920) 184 Cal. 21 (*Pacific Wharf*); *Getz Brothers, supra*, 147 Cal. 115; *Vulcan Powder, supra*, 96 Cal. 510.) But these decisions did not invalidate contractual provisions merely because they restrained trade in some way. Instead, we examined the purpose of the contracts at issue, much as we would do in a reasonableness inquiry, and we found the contracts to be invalid when their purpose was to restrain trade by creating a monopoly, restricting supply, or fixing prices. (See *Cipro, supra*, 61 Cal.4th at p. 146 [recounting that the rule of reason asks " 'whether the challenged conduct promotes or suppresses competition' "].)

In *Morey*, for example, we invalidated an agreement requiring a vendor to sell lobsters exclusively to a purchaser in a certain geographic area. (*Morey*, *supra*, 187 Cal. at pp. 732, 736.) We emphasized that the overall purpose of the agreement was to "secure to [the purchaser], so far as possible, a monopoly of the lobster business in the selected territory." (*Id.* at p. 738; see *id.* at p. 736 [contract had "the purpose of putting it into the power of the [purchaser] to control the lobster market"]; *id.* at p. 737 [contract "intended to effect a virtual monopoly of the lobster trade"].) Our reasoning was more concerned with the potential monopoly effect of the agreement than with whether its terms limited trade per se.

Our other decisions in the business context followed similar logic. (See *Endicott v. Rosenthal* (1932) 216 Cal. 721, 725 (*Endicott*) [invalidating an agreement between clothes dyeing businesses to form an association that set industry-wide prices and prevented its members from soliciting each other's customers because "the two main purposes for which this association was formed were to increase prices and eliminate competition"]; *Getz Brothers*, *supra*, 147 Cal. at p. 119 [invalidating a contract by two companies to exclusively buy and sell salt from each other and to discourage salt shipments by third parties because it had a "direct and primary purpose" to restrain trade]; *Santa Clara Val. M. & L. Co. v. Hayes* (1888) 76 Cal. 387, 392 [invalidating exclusive dealing agreement with an "object and view to suppress the supply and enhance the price of lumber in four counties of the state"]; but see *Pacific Wharf*, *supra*, 184 Cal. at p. 23 [invalidating agreement forbidding seller of harbor dredge to compete in the dredging business because "[t]he language of [Civil Code former section 1673] is clear and unambiguous"].)

Our last decision to interpret Civil Code former section 1673 in the context of business dealings made clear that a rule of reason applies in this context. In *Great Western Distillery*, *supra,* 10 Cal.2d 442, we upheld a contract in which a buyer agreed to purchase whiskey exclusively from a distillery in exchange for being the sole merchant of that whiskey in California. We summarized the law as follows: " 'Statutes are interpreted in the light of reason and common sense, and it may be stated as a general rule that courts will not hold to be in restraint of trade a contract between individuals, the main purpose and effect of which are to promote and increase business in the line affected, merely because its operations might possibly in some theoretical way incidentally and indirectly restrict trade in such line.' " (*Id.* at p. 446.) Reviewing the cases upholding and invalidating contractual agreements, we explained that this general rule was consistent with each of them. (*Id.* at pp. 447–449, citing *Associated Oil*, *supra*, 217 Cal. at p. 304, *Grogan*, *supra*, 156 Cal. at p. 615, *Morey*, *supra*, 187 Cal. 727, *Endicott*, *supra*, 216 Cal. 721.) Applying this rule to the agreement at issue, we upheld the agreement because it "disclose[d] merely an intent to provide for the promotion of the business of the defendant" and had the effect of "develop[ing] a market for the sale of the commodity within the limited territory." (*Great Western Distillery*, at pp. 449, 450.)

Thus, like previous decisions evaluating business contracts, *Great Western Distillery* rejected a literal reading of Civil Code former section 1673 in favor of a rule of reasonableness: Contracts with the purpose and effect of promoting trade and competition are valid even if their terms incidentally restrain commercial freedom in some way. After *Great Western Distillery*, the "trend of authorities [was] to

30

construe such statutes as [former] section 1673 of the Civil Code, and contracts between individuals intended to promote rather than to restrict a particular business, '[i]n the light of reason and common sense' so as to uphold reasonable limited restrictions." (*Keating v. Preston* (1940) 42 Cal.App.2d 110, 123, quoting *Great Western Distillery*, *supra*, 10 Cal.2d at p. 446.)

To summarize, our decisions interpreting Civil Code former section 1673, the predecessor to Business and Professions Code section 16600, gradually evolved to evaluate contractual restraints on business operations and commercial dealings based on a reasonableness standard. In this respect, Civil Code former section 1673 did not depart from the common law rule. (See *Centeno*, *supra*, 107 Cal.App.3d at p. 68 [observing in a case involving an exclusive medical services contract that "[s]ection 16600 is basically a codification of the common law relating to contracts in restraint of trade"].) But we often interpreted the statute more strictly when it came to agreements not to compete after the termination of employment or the sale of interest in a business. Thus, instead of adopting a per se rule that all contractual limitations on the freedom to engage in commercial dealings are invalid, our precedent interpreting Civil Code former section 1673 was more nuanced.

In 1941, the Legislature repealed Civil Code former section 1673 and reenacted it as Business and Professions Code section 16600 using substantively identical language. (Stats. 1941, ch. 526, § 1, p. 1834.) In doing so, the Legislature is presumed to have incorporated this court's construction of Civil Code former section 1673 into section 16600. (*People v. Bonnetta*, *supra*, 46 Cal.4th at p. 151.) Since then, this court has had occasion to construe section 16600 only in relation to contracts restraining competition after the termination of

employment or the sale of interest in a business. (See *Edwards*, *supra*, 44 Cal.4th at p. 950 [termination of employment]; *Swenson v. File* (1970) 3 Cal.3d 389, 395 (*Swenson*) [termination of partnership]; *Muggill v. Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 242–243 (*Muggill*) [termination of employment]; *Martinez v. Martinez* (1953) 41 Cal.2d 704, 706 (*Martinez*) [sale of business].) These cases have followed our earlier decisions by strictly construing the prohibition on restraint of trade in such contexts.

In *Muggill*, we invalidated a noncompetition agreement between a retiree and his former employer when the former employer ceased pension payments after the employee went to work for a competitor. (*Muggill*, *supra*, 62 Cal.2d at p. 240.) We said that the "settled interpretation" of section 16600 created an unambiguous rule: "This section invalidates provisions in employment contracts prohibiting an employee from working for a competitor after completion of his employment . . . ." (*Muggill*, at pp. 243, 242). Comparing the facts to those in *Chamberlain*, a pre-reenactment decision involving the sale of business stock by a former employee, we stated that "[s]imilarly, in this case, the provision forfeiting plaintiff's pension rights if he works for a competitor restrains him from engaging in a lawful business and is therefore void." (*Id.* at p. 243.)

Even when we have upheld portions of noncompetition agreements under statutory exceptions to section 16600, we have recognized that any portion of the agreement restraining competition not within an exception is per se invalid. For example, we said in *Swenson* that a noncompetition agreement between a former partner of an accounting firm and his firm would fall outside the section 16602 exception and thus be invalid "[o]n its face" if "it forb[ade him] from serving former

32

partnership clients without regard to territorial limits." (*Swenson, supra*, 3 Cal.3d at p. 395; see § 16602, subd. (a) ["Any partner may, upon [dissolution or disassociation from the partnership], agree that he or she will not carry on a similar business within a specified geographic area where the partnership business has been transacted, so long as any other member of the partnership . . . carries on a like business therein."]; see also *Martinez, supra*, 41 Cal.2d at p. 706 [trial court "properly limited the duration of the covenant [not to compete] by providing that it should continue so long as plaintiff . . . should carry on a like business in San Diego County, that being the period permitted by sections 16600 and 16601 of the Business and Professions Code"].)

Our most recent section 16600 decision broke no new ground in holding that a noncompetition agreement between a tax manager and his employer was per se invalid. (*Edwards, supra*, 44 Cal.4th at p. 955.) The plaintiff in *Edwards* signed an agreement with his employer Arthur Andersen, which prohibited him from working for or soliciting certain clients of the firm for limited periods following his termination of employment. (*Id.* at p. 942.) When HSBC acquired Arthur Andersen, it offered to employ Edwards on the condition that he sign a " 'Termination of Non-compete Agreement,' " which would effect a general release of claims against Arthur Andersen and, in turn, induce Arthur Andersen to release Edwards from the noncompetition agreement he had previously signed. (*Id.* at p. 943.) When Edwards refused to sign the termination of noncompete agreement, Arthur Andersen fired him, and HSBC withdrew its offer to employ him. (*Ibid.*) Edwards sued Arthur Andersen for interference with prospective economic advantage, claiming that the interference was wrongful because the

underlying noncompetition agreement he signed was invalid under section 16600. (*Edwards*, at p. 944.)

We agreed, holding that "an employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business unless the agreement falls within one of the exceptions to the rule." (*Edwards*, *supra*, 44 Cal.4th at pp. 946–947.) We said that section 16600 and its predecessor statute had rejected the common law " 'rule of reasonableness' " for a "legislative policy in favor of open competition and employee mobility." (*Edwards*, at pp. 945, 946.) Stressing the statute's plain meaning, we rejected the argument that section 16600 only voids restraints that entirely prohibit an employee from engaging in a profession and not less restrictive limitations that are reasonable. (*Edwards*, at pp. 946–947.) Similarly, we rejected the Ninth Circuit's "narrow restraint" construction of section 16600, which excepted agreements limiting only a narrow part of a party's business, trade, or profession. (*Edwards*, at pp. 948–950.)

Ixchel argues that *Edwards* conclusively held that section 16600 invalidates all restraints on trade for all contracts, no matter how reasonable. It relies on our conclusion that "[s]ection 16600 is unambiguous, and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect." (*Edwards*, *supra*, 44 Cal.4th at p. 950.) But Ixchel reads too much into *Edwards*. "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court." (*Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195.) The plaintiff in *Edwards* sought to invalidate a noncompetition clause in his employment agreement, and we "limited our review" to whether

"Business and Professions Code section 16600 prohibit[s] employee noncompetition agreements . . . ." (*Edwards*, at p. 941, fn. omitted.) We held that "section 16600 prohibits employee noncompetition agreements unless the agreement falls within a statutory exception . . . ." (*Id.* at p. 942.) The question of whether noncompetition agreements outside the employment context are per se invalid was not presented in *Edwards*.

Moreover, the rationale in *Edwards* focused on policy considerations specific to employment mobility and competition: "The law protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.' [Citation.] It protects 'the important legal right of persons to engage in businesses and occupations of their choosing.' " (*Edwards*, *supra*, 44 Cal.4th at p. 946; see *ibid.* [the statute "evinces a settled legislative policy in favor of open competition and employee mobility"].) And we cited cases exclusively from the employment context in our reasoning. (*Id.* at pp. 945–948, citing *Bosley Medical Group v. Abramson* (1984) 161 Cal.App.3d 284, *D'sa v. Playhut, Inc.* (2000) 85 Cal.App.4th 927, *Muggill*, *supra*, 62 Cal.2d 239, *Chamberlain*, *supra*, 172 Cal. 285, *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, *South Bay Radiology Medical Associates v. Asher* (1990) 220 Cal.App.3d 1074, and *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34.)

Finally, the holding and language in *Edwards* simply confirmed our long line of decisions interpreting section 16600 strictly in the context of noncompetition agreements following the termination of employment or the sale of interest in a business. Nothing about *Edwards* indicates a departure from that precedent to also invalidate reasonable contractual

limitations on business operations and commercial dealings. Nor did *Edwards* address our substantial body of law permitting such reasonable limitations.

In sum, a survey of our precedent construing section 16600 and its predecessor statute reveals that we have long applied a reasonableness standard to contractual restraints on business operations and commercial dealings. We do not disturb the holding in *Edwards* and other decisions strictly interpreting section 16600 to invalidate noncompetition agreements following the termination of employment or sale of interest in a business. But those cases do not call into doubt the applicability of a reasonableness standard to contractual restraints on business operations and commercial dealings.

## C.

We also consider section 16600 in its broader statutory context and seek to harmonize its language with related provisions. (*ZB*, *supra*, 8 Cal.5th at p. 189.) Section 16600 appears alongside the Cartwright Act (§ 16700 et seq.), which also employs broadly worded language to prohibit agreements in restraint of trade. Section 16722 provides: "Any contract or agreement in violation of this chapter is absolutely void and is not enforceable at law or in equity." And section 16726 provides: "Except as provided in this chapter, every trust is unlawful, against public policy and void." But we have not interpreted these provisions in a sweeping fashion. "Though the Cartwright Act is written in absolute terms, in practice not every agreement within the four corners of its prohibitions has been deemed illegal." (*Cipro*, *supra*, 61 Cal.4th at p. 136.) The provisions of the Cartwright Act "draw upon the common law prohibition against restraints of trade." (*Cipro*, at p. 136; accord, *Speegle*,

*supra*, 29 Cal.2d at p. 44.)  Accordingly, this court has taken direction from the common law in establishing a reasonableness standard for determining whether an agreement violates the Cartwright Act.  (*Cipro*, at pp. 137, 146.)  That standard asks whether an agreement " 'promotes or suppresses competition' " by considering the " 'circumstances, details, and logic of a restraint.' "  (*Id*. at pp. 146, 147.)

Similarly, Civil Code former section 1673 was enacted against the backdrop of a common law standard prohibiting unreasonable restraints of trade.  Our interpretation of that statute and section 16600 did not depart from the common law reasonableness standard for contractual restraints on business operations and commercial dealings.  Section 16600 should therefore be read in accordance with the Cartwright Act to incorporate the same rule of reason in such cases.  Indeed, we have occasionally relied on antitrust decisions when interpreting Civil Code former section 1673 (see *Great Western Distillery*, *supra*, 10 Cal.2d at pp. 448–449, citing *United States v. American Tobacco Co*. (1911) 221 U.S. 106, 179), and Courts of Appeal have evaluated section 16600 and antitrust claims together under a reasonableness standard (see *Dayton Time Lock*, *supra*, 52 Cal.App.3d at p. 6; *Lafortune v. Ebie* (1972) 26 Cal.App.3d 72, 74–75).

Amicus curiae Beckman Coulter, Inc. argues that *Cianci v. Superior Court* (1985) 40 Cal.3d 903 (*Cianci*) rejected the use of the Cartwright Act as an aid to construing section 16600. *Cianci* held that the Cartwright Act applied to the medical profession.  In doing so, we overturned a previous decision that reasoned that because section 16600 includes the word "profession" in its scope, the absence of the same word in the Cartwright Act implied that it was not intended to apply to

professions. (*Cianci*, at pp. 921–922, citing *Willis v. Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 809.) We concluded that because section 16600 and the Cartwright Act were enacted separately and only later consolidated in the Business and Professions Code, " 'a finding of legislative intent to exclude the professions from the Cartwright Act, based upon nothing more than language differences between the two code sections, exceeds the limits of plausible inference.' " (*Cianci*, at p. 922.) But *Cianci*'s focus on a specific textual difference between the two statutes does not cast doubt on the broader point here: The similarities between the two statutes stretch beyond their language. They share a statutory purpose and doctrinal heritage in common law prohibitions on restraints of trade. They should therefore be interpreted together.

## D.

Finally, we are mindful of the consequences of strictly interpreting the language of section 16600 to invalidate all contracts that limit the freedom to engage in commercial dealing. "*Every* agreement concerning trade . . . restrains." (*Chicago Board of Trade v. United States* (1918) 246 U.S. 231, 238.) In certain circumstances, contractual limitations on the freedom to engage in commercial dealings can promote competition. Businesses engaged in commerce routinely employ legitimate partnership and exclusive dealing arrangements, which limit the parties' freedom to engage in commerce with third parties. Such arrangements can help businesses leverage complementary capabilities, ensure stability in supply or demand, and protect their research, development, and marketing efforts from being exploited by contractual partners.

These arrangements can have procompetitive effects since they "enable long-term planning on the basis of known costs," "give protection against price fluctuations, and — of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified — offer the possibility of a predictable market." (*Standard Oil Co. of California v. United States* (1949) 337 U.S. 293, 306–307; see also *Sterling Merchandising, Inc. v. Nestle, S.A.* (1st Cir. 2011) 656 F.3d 112, 123 ["exclusive dealing agreements 'can achieve legitimate economic benefits (reduced cost, stable long-term supply, predictable prices)' "].) Exclusive dealing arrangements also "may provide an incentive for the marketing of new products and a guarantee of quality-control distribution." (*Dayton Time Lock*, *supra*, 52 Cal.App.3d at p. 6; accord, *Fisherman's Wharf Bay Cruise Corp. v. Superior Court of San Francisco* (2003) 114 Cal.App.4th 309, 335.) For example, exclusive dealing arrangements are "often a part of a franchise agreement or a distributorship contract." (*UAS Management, Inc. v. Mater Misericordiae Hospital* (2008) 169 Cal.App.4th 357, 365.) In exchange for the right to sell the franchisor's products, franchisees often agree to purchase from a particular supplier or operate in a particular geographic area. (See, e.g., *Dayton Time Lock*, at pp. 4–5 [describing franchise agreement].) We decline to construe section 16600 to call such arrangements into question simply because they restrain trade in some way.

Ixchel and amicus curiae Beckman Coulter, Inc. argue that these dire consequences are exaggerated because section 16600 only voids agreements that restrain a party from "*engaging in* a lawful . . . business" and not all contractual restraints on business activity do so. (Italics added.) But they do not explain where the line is to be drawn. Many forms of

exclusive dealing restrain parties from "engaging in a lawful . . . business." (§ 16600.) Franchise agreements often prohibit the franchisee from selling a third party's products; requirements and output contracts restrain buyers and sellers respectively from doing business with third parties. In *Great Western Distillery*, we upheld a contract in which a business agreed to purchase whiskey exclusively from another whiskey distillery in exchange for being the sole merchant of that whiskey in California. (*Great Western Distillery*, *supra*, 10 Cal.2d at pp. 445–446.) Under the agreement, the purchaser was restrained from engaging in the business of buying whiskey from a third party, and the whiskey distiller was restrained from doing any business with other potential whiskey buyers. Our opinion applied a reasonableness standard in determining whether the agreement ran afoul of Civil Code former section 1673. (*Great Western Distillery*, at pp. 445–446.) Similarly here, the Forward-Biogen Agreement restrained Forward from engaging in business with Ixchel or another third party to develop drugs containing the active ingredient DMF. Ixchel fails to meaningfully differentiate *Great Western Distillery* from this case with respect to the applicability of a reasonableness standard.

## CONCLUSION

We hold that tortious interference with at-will contracts requires independent wrongfulness. Because Ixchel alleges that Biogen interfered with its at-will contract, it must allege that Biogen did so through wrongful means.

We also hold that a rule of reason applies to determine the validity of a contractual provision by which a business is restrained from engaging in a lawful trade or business with

another business.   Section 2.13 of the Biogen-Forward Agreement is such a restraint because it prevents Forward from collaborating with Ixchel or any other partner in the development of treatments containing the active ingredient DMF.   Its validity under section 16600 must therefore be evaluated based on a rule of reason.  We express no view on the validity of the agreement at issue.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Ixchel Pharma, LLC v. Biogen, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S256927
**Date Filed:** August 3, 2020
_____

**Court:**
**County:**
**Judge:**


_____

**Counsel:**

Banys, Christopher D. Banys and Richard C. Lin for Plaintiff and Appellant.

California Appellate Law Group, Anna-Rose Mathieson, Greg Wolff; Behmer & Blackford, Timothy S. Blackford; Williams & Connolly, John E. Schmidtlein and Carl R. Metz for Beckman Coulter, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Ropes & Gray, Mark S. Popofsky, Rocky Chiu-Feng Tsai; Greines, Martin, Stein & Richland and Laurie J. Hepler for Defendant and Respondent.

Gibson, Dunn & Crutcher, Thomas G. Hungar, Rachel S. Brass, Caeli A. Higney; LevatoLaw and Ronald C. Cohen for California Chamber of Commerce and California Business Roundtable as Amici Curiae on behalf of Defendant and Respondent.

Lowenstein & Weatherwax and Kenneth J. Weatherwax for Amici Scholars as Amici Curiae.

Horvitz & Levy, Robert H. Wright, Jeremy B. Rosen; Charis Lex and Sean P. Gates for Quidel Corporation as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christopher D. Banys
Banys, P.C.
567 Marsh Street
San Luis Obispo, CA 93401
(650) 308-8505

Carl R. Metz
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Laurie J. Hepler
Greines, Martin, Stein & Richland LLP
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 315-1774