**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| ROBERT S. SAMUELIAN et al., | |
| Plaintiffs and Respondents, | G061911, G062416 & G062426 |
| v. | (Super. Ct. No. 30-2021-01194619) |
| LIFE GENERATIONS HEALTHCARE, LLC, et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendants and Appellants. | |

This court hereby orders that the opinion filed on August 20, 2024, be modified as follows:

1.      On page 37, delete the first full paragraph (starting with, "The Samuelians also highlight …") and replace it with the following:

> The Samuelians also highlight the trial court's
> finding that "the record . . . reflects that [Section 6.4]
> arose in connection with the termination of
> employment." But the arbitrator never made this
> factual finding. Indeed, his order denying the
> reconsideration motion stated, this "is not an
> employment contract case . . . involving an
> employee." Neither side has shown the trial court had

authority to make new factual findings as to this issue. And we will not make that argument for them. (See *City of Riverside v. Horspool*, *supra*, 223 Cal.App.4th at p. 679, fn. 8.) To clarify, we do not mean to imply the arbitrator affirmatively found that Section 6.4 did not arise from the termination of employment, as it does not appear this issue was fully litigated in the arbitration.

The petition for rehearing is DENIED. This modification does not change the judgment.

MOORE, ACTING P. J.

WE CONCUR:

GOETHALS, J.

SANCHEZ, J.

2

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| ROBERT S. SAMUELIAN et al., | G061911, G062416 & G062426 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 30-2021-01194619) |
| LIFE GENERATIONS HEALTHCARE, LLC, et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Layne H. Melzer, Judge. Reversed.

Horvitz & Levy, Robert H. Wright, Melissa B. Whalen and Jeremy B. Rosen; Wilson, Elser, Moskowitz, Edelman & Dicker and Gary S. Pancer; Law Offices of Kevin E. Monson, Kevin E. Monson and David A. Sprowl for Defendant and Appellant Life Generations Healthcare.

Doll Amir Eley, Michael Amir, Mary Glarum, Brett Oberst; Greines, Martin, Stein & Richland, Timothy Coates, Jeffrey E. Raskin; Tantalo & Adler, Joel M. Tantalo, Michael S. Adler; Murchison & Cumming, William Naeve and Nancy J. DePasquale for Defendants and Appellants.

Payne & Fears, Daniel L. Rasmussen, Benjamin A. Nix; Gibson, Dunn & Crutcher, Blaine H. Evanson and Matt Aidan Getz for Plaintiffs and Respondents.

\* \* \*

Absent an applicable exception, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Bus. & Prof. Code, § 16600, subd. (a).)[1] Our Supreme Court recently clarified in *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1159 (*Ixchel*) that one of two standards applies to determine whether noncompetition agreements are void under section 16600. Restraints are either void per se (the per se standard) or evaluated under a reasonableness test (the reasonableness standard). The former standard applies to restraints arising from "termination of employment or the sale of interest in a business," while the latter applies to "agreements limiting commercial dealings and business operations." (*Ixchel*, at p. 1152.) We are not aware of any authority addressing the applicable standard to cases outside these categories.

This case involves a noncompetition restraint following the sale of a portion of a business interest. Respondents Robert and Stephen Samuelian (collectively, the Samuelians)[2] co-founded appellant Life Generations Healthcare, LLC (the Company) along with appellant Thomas Olds, Jr. Initially, the Samuelians owned nearly half the Company together. They later sold a portion of this interest. In connection with this partial sale,

---

[1] All further undesignated statutory references are to the Business and Professions Code.

[2] We refer to the Samuelians individually by their first names.

the Company adopted a new operating agreement that restrained its members, including the Samuelians, from competing with the Company.

The Samuelians later filed a dispute in arbitration challenging the enforceability of this noncompetition provision. The arbitrator found the provision arose from the sale of a business interest. As such, he concluded it was invalid per se and rejected the Company's argument for application of the reasonableness standard under *Ixchel*. However, prior to the arbitration, the parties had signed an agreement barring the arbitrator from making any errors of law. So, when the Samuelians later petitioned for confirmation of the arbitration award, the Company argued the arbitrator had legally erred by applying the per se standard. The trial court reviewed the arbitrator's ruling de novo, found no error, and confirmed the award.

On appeal, the Company admits that under *Ixchel* and other precedent, the per se standard applies to noncompetition restraints arising from the sale of an *entire* business interest. But it argues no case has held that the per se standard applies to restraints arising from the sale of a *partial* business interest, as is the case here. It asserts the reasonableness standard should apply in such cases.

After reviewing relevant Supreme Court authority and public policy, we agree with the Company. No case has addressed this issue, and nothing in the policy behind section 16600 calls for application of the per se standard to partial sales. A sale of a partial business interest differs drastically from the sale of an entire business interest. Following a partial sale, the seller remains an owner of the company and may still exercise some degree of control over its operations. Given this context, a noncompetition provision arising from a partial sale cannot be deemed inherently anticompetitive and invalidated per se under section 16600. Rather, it must

3

be scrutinized under the reasonableness standard to determine whether it has procompetitive benefits given the nature of the selling owner's continuing connection to the business.

Due to our conclusion that the arbitrator applied the wrong standard under section 16600, we do not address the other arguments raised by Olds and the other appellants concerning purported errors that occurred later in the arbitration. The trial court's judgment confirming the arbitrator's award is reversed.

FACTS AND PROCEDURAL HISTORY

I.

*THE COMPANY*

The Company operates numerous skilled nursing and related healthcare facilities in California and Nevada. It was founded by the Samuelians and Olds in 1998. The Company was initially formed as a limited liability company but incorporated a year later

Following incorporation, the Samuelians owned a combined 49.4 percent of the Company, with Steven owning 31.3 percent and Robert owing 18.1 percent. The other owners were appellants Olds (34.7 percent), Fred Smith (5.7 percent) and Lois Mastrocola (4 percent), and nonparties Mark Howlett (4.8 percent), and Paul Haider (1.4 percent).[3] The Samuelians and Olds were on the Company's board of directors, and Robert was its general counsel.

Tensions allegedly arose over the years between Olds and the Samuelians over the Company's direction. In 2007, the parties agreed to a

---

[3] All ownership percentages have been rounded to the nearest tenth.

partial buyout of the Samuelians' interest in the Company and to reorganize the Company from a corporation back to a limited liability company.

On October 25, 2007, the shareholders exchanged their shares in the Company for ownership units in the reorganized limited liability company. That same day, a new operating agreement for the Company (the operating agreement) was entered into by its member—Olds, the Samuelians, Howlett, Smith, Haider, and Mastrocola. The operating agreement specified the Company would initially be managed by three managers, but the number of managers could be changed over time.[4] Olds and the Samuelians were elected as the Company's first managers. Olds was named president and chief executive officer, and Mastrocola was named secretary and chief financial officer. Mastrocola was later appointed as a manager in 2012.

A few days later, on October 29, the Company contracted to buy nearly half of the Samuelians' total interest for roughly $61 million. It also agreed to purchase all of Howlett and Haider's interest in the Company. Following these buyouts, Olds owned 59.4 percent of the Company, Smith owned 9.7 percent, Mastrocola owned 7 percent, and the Samuelians owned a combined 23.9 percent (Steven owned 15.1 percent and Robert owned 8.8 percent).

That same day, Robert resigned from all the positions he held at the Company except for general counsel and his membership in a special committee (the LM Compensation Committee) holding approval rights over

---

[4] Limited liability companies can be managed by members or by managers. (Corp. Code, § 17704.07, subds. (b) & (c).) "A limited liability company is a member-managed limited liability company unless the articles of organization" specify it is to be managed by a manager. (Corp. Code, §§ 17704.07, subd. (a), 17702.01, subd. (b)(5).)

the terms of Mastrocola's employment, including her job duties, compensation, benefits, and termination. Stephen also resigned from all positions he held at the Company except for his membership in the LM Compensation Committee. Despite these resignations, the Samuelians still retained certain voting right as owners of the Company, which are described below.

Under the operating agreement, the Samuelians would remain members on the three-person LM Compensation Committee as long as they were owners of the Company (the Chairman of the Board of Managers would be the third member). Changes to the terms of Mastrocola's employment require approval from two members on the LM Compensation Committee, so no changes to these terms could be made without consent from at least one of the Samuelians.

Likewise, the operating agreement provides that as long as a Samuelian remained an owner, consent from at least one of them was required (1) for any amendments or changes to the operating agreement or the Company's articles of organization, (2) for any split, combination, or reclassification of any membership interests, (3) for any transaction or agreement between the Company and a unitholder, unitholder's family member, or entities affiliated with a unitholder or a unitholder's family, (4) to increase the number of ownership units that could be granted as options, and (5) to engage the Company in a new line of business.

The operating agreement also requires the Company to provide the Samuelians with (1) monthly financial statements (both audited and unaudited), including balance sheets, income statements, and cash flow statements, and (2) notices of any loan defaults or lawsuits filed against the

6

Company (or its subsidiaries) that could exceed its insurance coverage or affect the value of its ownership units.

Section 6.4 of the operating agreement imposes fiduciary duties on all the Company's members, including the Samuelians (section 6.4). Section 6.4(a) states, "The Unitholders acknowledge and agree that the provisions of this Section 6.4 are expressions of their fiduciary duties (including, without limitation, the duty of loyalty) to the Company as Unitholders . . . ." Section 6.4(b) provides that "[n]o Unitholder or Manager shall . . . Engage in the Business within the State of California except on behalf of the Company" (the noncompetition provision). Section 6.4(e)(i) requires "each Unitholder and Manager . . . to present to the Company any opportunity to Engage in the Business in California that formally comes to his or her attention in writing" (the corporate opportunities provision). "Business" means, "(i) the ownership and/or operation of skilled nursing, assisted living, Alzheimer disease and/or physical, occupational or speech therapy facilities; (ii) the provision of nurse registry services; and (iii) the ownership and/or operation of pharmacies and the provision of pharmacy services."

If a unitholder breaches section 6.4, the operating agreement allows the Company to purchase "all or any portion" of the breaching party's units for fair market value after timely delivering written notice.

II.

*THE ARBITRATION FILING*

The Company allegedly discovered in April 2015 that the Samuelians had breached the noncompetition and corporate opportunities provisions. It purported to exercise its right under the operating agreement to

7

buy the Samuelians' entire ownership interest. It sent them the required notices and tendered two checks totaling about $19.5 million.

The Samuelians denied any wrongdoing and refused the checks. But they were cut out of the Company and Smith, Mastrocola, and Olds (collectively, the individual defendants) absorbed their ownership interests. Thereafter, the Company did not pay the Samuelians any profit distributions or obtain any required approvals from them, such as approval to increase Mastrocola's salary.

The Samuelians initiated an arbitration action against the Company and Olds in June 2015 and later added Mastrocola and Smith as defendants. The Samuelians sought declaratory relief concerning the validity of the Company's forced buyout, and they also alleged individual and derivative claims against the Company and the individual defendants (collectively, the defendants) for breach of contract, breach of fiduciary duty, conversion, and fraud, among other claims.

The Company cross-complained against the Samuelians. It alleged they had breached the noncompetition and corporate opportunities provisions, and it also sought declaratory relief as to the buyout's validity.

The arbitration was initially filed with the American Arbitration Association, but the parties entered a written agreement (the transfer agreement) transferring the arbitration action to Judicate West and selecting Judge Stuart Waldrip (Ret.) as their arbitrator. The transfer agreement also expressly limits the arbitrator's power: "The Arbitrator shall not have the power to commit errors of law or legal reasoning and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error."

The arbitration was trifurcated into three phases. Phase One focused on the whether the Company could enforce the noncompetition and corporate opportunities provisions against the Samuelians. Phase Two covered the Samuelians' claims for breach of contract, breach of fiduciary duty, and conversion against the individual defendants. Phase Three involved the Samuelians' direct claims for damages against the Company and their derivative claims asserted on the Company's behalf.

### III.

### *PHASE ONE*

The arbitrator issued his Phase One rulings in May 2017. He found the noncompetition and corporate opportunities provisions were unenforceable. The noncompetition provision was a contractual restraint on trade that was invalid per se under section 16600. Further, the Samuelians owed no fiduciary duties to the Company because they were members in a manager-managed limited liability company (manager-managed company). He explained that under applicable law, fiduciary obligations are only imposed on members in a member-managed limited liability company (member-managed company) or managers in a manager-managed company.

The arbitrator also rejected defendants' contention that the noncompetition provision was valid under section 16601. This section provides that "any owner of a business entity selling . . . *all of his or her ownership interest* in the business entity . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, . . . so long as the buyer . . . carries on a like business therein." (§ 16601, italics added.) The arbitrator found section 16601 did not apply because the Samuelians only sold part, not all, of their interest during the Company's reorganization in 2007. Further, the arbitrator noted

9

the noncompetition provision was invalid under section 16601 because it was not reasonably limited in time or geographic scope.

Next, the arbitrator found the corporate opportunities provision was invalid because it was intertwined with the noncompetition provision and could not be severed from it. It also concluded this provision was "a thinly disguised non-compete itself" because it placed "a significant restraint on doing business by requiring presentation to the Company" of various business opportunities.

Based on these findings, the arbitrator held the Company's forced buyout of the Samuelians was invalid. The Samuelians remained members in the Company and, therefore, were entitled to all rights and privileges afforded to them under the operating agreement.

Defendants later brought a motion for reconsideration of the arbitrator's Phase One rulings (the reconsideration motion) in September 2020, after *Ixchel* was decided.[5] They argued the arbitrator's ruling was erroneous because it had applied the per se standard to the noncompetition provision. They claimed the arbitrator must apply the reasonableness standard under *Ixchel*.

The Samuelians objected to the reconsideration motion on grounds it was untimely. The arbitrator overruled this objection and exercised his discretion to hear the motion. But he denied it on grounds the Phase One ruling did not conflict with *Ixchel*. In particular, the arbitrator

---

[5] Defendants had previously moved for reconsideration following *Quidel Corp. v. Superior Court* (2019) 39 Cal.App.5th 530, which also interpreted section 16600. This motion was denied. The Supreme Court later granted review of *Quidel* and ordered it to be vacated and reconsidered in light of *Ixchel*. (*Quidel Corp. v. Superior Court* (2020) 57 Cal.App.5th 155.)

10

explained that *Ixchel* held the per se standard applies to noncompetition provisions arising from "the sale of interest in a business." (Quoting *Ixchel, supra*, 9 Cal.5th at p. 1159.) He found the noncompetition provision arose from the Samuelians' 2007 sale of a portion of their interest in the Company. Thus, he concluded the per se standard applied under *Ixchel*.

## IV.

### *PHASE TWO*

Due to our conclusion that the arbitrator's Phase One rulings were incorrect, we only briefly recite the history of Phase Two and Phase Three.

The Samuelians demurred to the Company's cross-complaint. Based on his Phase One rulings, the arbitrator sustained the demurrer without leave to amend as to all claims based on the noncompetition and corporate opportunities provisions.

In Phase Two, the arbitrator noted that following their wrongful ouster from the Company, the Samuelians received no distributions while the individual defendants received millions of dollars. The arbitrator found the individual defendants had wrongfully withheld distributions from the Samuelians under three separate theories: conversion, breach of fiduciary duty, and breach of contract. Specifically, he found all the individual defendants were liable for conversion, while only Mastrocola and Olds were liable for breach of contract and breach of fiduciary duty since they were managers of the Company (Smith was not). The arbitrator explained the Samuelians could only "recover under one of the three alternate theories" of liability, with conversion being the primary theory of recovery and breach of fiduciary duty and breach of contract providing alternative theories.

11

## V.

## *PHASE THREE*

In Phase Three, the arbitrator built on the findings of Phase One and Phase Two to fashion a multilayered award for all the claims arising from the Samuelians wrongful ouster from the Company and the resulting unpaid distributions (the award). The award determined the Company owed the Samuelians roughly $21.1 million in unpaid distributions (about $13.4 million to Steven and $7.7 million to Robert) plus interest. If the Company paid this sum, it would not have to claw back distributions made to the individual defendants, nor would the Samuelians be able to recover damages for the unpaid distributions against the individual defendants under the Phase Two ruling. The arbitrator explained this award was designed to "make [the Company] the prime mover in rectifying the financial and business relationships between the owners of the Company. The 'backup plan' involve[d] clawing back funds from members who ha[d] received disproportionate distributions."

The award also found Mastrocola's salary had been improperly increased without the Samuelians' approval. Thus, Mastrocola was ordered to return the unapproved portion of her salary to the Company.

Finally, because the Samuelians were the prevailing parties in the litigation, they were awarded about $5.7 million in reasonable attorney fees and costs under the operating agreement.

## VI.

## *TRIAL COURT*

The Samuelians petitioned the trial court to confirm the award, while the Company and the individual defendants filed separate petitions to vacate or correct it. Following numerous briefs and hearings, the trial court

12

granted the Samuelians' petition to confirm and denied both petitions to vacate. It issued a statement of decision explaining its ruling.

To begin, the court explained the transfer agreement allowed it to review the arbitrator's award for legal error but not factual errors or abuses of discretion.

As to the noncompetition provision's validity, the court explained that under *Ixchel*, noncompetition agreements tied to the sale of a business interest are invalid per se. Here, the arbitrator had made an unreviewable factual finding that the noncompetition provision arose from the sale of a business interest. As such, the per se standard applied. The court also noted that even if the arbitrator had applied the wrong standard, that error was not prejudicial because the arbitrator had found the noncompetition provision was unreasonable based on its temporal and geographic scope.

Likewise, the court found no legal error as to arbitrator's finding that the corporate opportunity provision was inseparable from the noncompetition provision and "a 'thinly disguised non-compete itself.'" Nor did it find any legal errors with the arbitrator's conclusion that the Samuelians did not owe the Company "fiduciary duties, explaining that under applicable law, fiduciary duties are only applicable to managers of a manager-managed LLC [(like the Company)], and not minority members."

Finally, the court concluded the arbitrator's Phase Two and Phase Three rulings contained no errors of law.

Judgment confirming the award was entered in August 2022. The Company and the individual defendants filed separate appeals challenging the court's confirmation of the award, and they ask for the award to be vacated. The Company's appeal primarily focuses on the Phase One rulings. It claims the arbitrator erred by applying the per se standard to the

13

noncompetition provision rather than the reasonableness standard. The individual defendants' appeal joins the Company's argument as to the Phase One rulings. They also contend the arbitrator made various legal errors in Phase Two and Phase Three as to the claims for conversion, breach of contract, breach of fiduciary duty, the claim concerning Mastrocola's salary, and the remedy.

We agree the arbitrator committed a prejudicial legal error in Phase One. The rulings in Phase Two and Phase Three were based on the Phase One ruling. Thus, the merits of the Phase Two and Phase Three rulings cannot be separated from the erroneous Phase One ruling, and the entire award must be vacated based on the errors in Phase One. (Code Civ. Proc., § 1286.2, subd. (a)(4); *VVA-TWO, LLC v. Impact Development Group, LLC* (2020) 48 Cal.App.5th 985, 998.)

DISCUSSION

I.

*STANDARD OF REVIEW*

A trial court's order confirming an arbitration award is reviewed de novo. (*Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1435.) Generally, however, arbitrators have broad authority and neither a trial court nor an appellate court can vacate an arbitration award based on a legal or factual error. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11.) The parties can alter this general rule by "requiring a dispute to be decided according to the rule of law, *and* mak[ing] plain their intention that the award is reviewable for legal error." (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1355 (*Cable Connection*).) "[T]o take themselves out of the general rule that the merits of the award are not subject to judicial

14

review, the parties must clearly agree that legal errors are an excess of arbitral authority that is reviewable by the courts." (*Id.* at p. 1361.)

Here, the transfer agreement expressly allows for review of the arbitrator's legal rulings: "The Arbitrator shall not have the power to commit errors of law or legal reasoning and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error."[6] As such, we review the award de novo for errors of law. (*Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 816; see *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1176 [questions of law are reviewed de novo].)

To obtain reversal, defendants must also show they were prejudiced by any legal error. (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 920.) Prejudice means there is a reasonably probability defendants would have received a more favorable result in the absence of the error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) "'[A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.'" (*Ibid.*)

## II.

### *PHASE ONE ISSUES*

The Company argues the arbitrator legally erred by applying the per se standard to the noncompetition provision. It contends the reasonableness standard applies. We agree.

---

[6] The language from the transfer agreement appears to be pulled directly from the contract at issue in *Cable Connection*. (*Cable Connection*, *supra*, 44 Cal.4th at p. 1340.)

*A. Forfeiture of the Argument*

Before turning to the merits of the Company's argument above, we address the Samuelians' contention that the Company forfeited it by failing to timely raise it during the arbitration. The Company raised this argument for the first time in the reconsideration motion, which was filed during Phase Three. The Samuelians claim this argument should have been made in Phase One.

We need not spend much time on the Samuelians' forfeiture argument, as the arbitrator rejected it during the arbitration. He ruled that even if the Company's argument for the reasonableness standard could have been made earlier, "timeliness [was] not an issue" because he was exercising his discretion to consider it. The trial court found it lacked authority to review the arbitrator's exercises of discretion. Neither party has argued this conclusion was wrong, and we will not make the argument on the Samuelians' behalf. (See *City of Riverside v. Horspool* (2014) 223 Cal.App.4th 670, 679, fn. 8.) Thus, we will not review the arbitrator's exercise of discretion.

Besides, we would find no abuse of discretion even if we could review the arbitrator's ruling. The reconsideration motion was filed after *Ixchel*. As described below, *Ixchel* provided a major clarification as to when the per se and reasonableness standards should be applied to noncompetition agreements. As such, it was not unreasonable for the arbitrator to reconsider his Phase One rulings on the noncompetition provision in light of *Ixchel*. (See *In re Marriage of Barth* (2012) 210 Cal.App.4th 363, 374 ["An abuse of discretion is only demonstrated when no reasonable judge could have made the challenged order"].)

16

*B.  The Per Se and Reasonableness Standards*

During the time of the arbitration, former section 16600 stated: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Former § 16600, added by Stats.1941, c. 526, § 1.) Section 16600 has since been amended, but the amendments are immaterial to our analysis.[7]

Under section 16600, noncompetition agreements are evaluated under one of two standards:  the per se standard or the reasonableness standard. Under the per se standard, noncompetition restraints are invalid per se "without regard to their reasonableness." (*Ixchel*, *supra*, 9 Cal.5th at p. 1152.) As for the reasonableness standard, courts examine "'whether an agreement harms competition more than it helps' by considering "'the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption.'"'" (*Id.* at p. 1150.) These standards were most recently discussed by the Supreme Court in *Ixchel* and *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937 (*Edwards*).

In *Edwards*, *supra*, 44 Cal.4th 937, the plaintiff was required to sign a noncompetition agreement as a condition of his employment with the defendant. The noncompetition agreement generally barred the plaintiff, an accountant, from working for or soliciting certain clients of the defendant

---

[7] Effective January 1, 2024, section 16600 added subdivisions clarifying it (1) applies broadly to void noncompetition agreements in the employment context, and (2) it not limited to contracts where the person being restrained is a party to the contract. (Now § 16600, subds. (b) & (c), as amended by Stats. 2023, ch. 828, §1.) Former section 16600 has been renumbered as subdivision (a).

following his termination. (*Id.* at p. 942.) The plaintiff later challenged the agreement's enforceability. (*Id.* at p. 943.)

Our Supreme Court concluded the noncompetition agreement was invalid per se under section 16600. (*Edwards*, *supra*, 44 Cal.4th at pp. 947–948.) The Court observed, "[u]nder the common law, as is still true in many states today, contractual restraints on the practice of a profession, business, or trade, were considered valid, as long as they were reasonably imposed." (*Id.* at p. 945.) But the Legislature "rejected the common law 'rule of reasonableness,'" by enacting Civil Code section 1673, repealed by Statutes 1941, chapter 526, section 2, which was later replaced by former section 16600. (*Ibid.*) "In the years since its original enactment as Civil Code section 1673, our courts have consistently affirmed that section 16600 evinces a settled legislative policy in favor of open competition and employee mobility." (*Id.* at p. 946.) "Under the statute's plain meaning . . . an employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business unless the agreement falls within one of the exceptions to the rule." (*Id.* at pp. 946–947.)

The court revisited section 16600 a few years later in *Ixchel*, which involved a noncompetition agreement between two pharmaceutical companies. The restrained party was barred from contracting with any third party to develop products containing a certain active ingredient (dimethyl fumarate). (*Ixchel*, *supra*, 9 Cal.5th at pp. 1138–1139.) This restraint was later challenged. The Supreme Court addressed two issues in *Ixchel*. First, it considered whether section 16600 applied outside the employment context to noncompetition agreements between businesses. After concluding it did, the Court next addressed whether such restraints were evaluated under the per se or reasonableness standard. (*Id.* at pp. 1148–1149.)

18

In answering the second question, the Court reviewed its prior decisions involving section 16600 and its predecessor, former Civil Code section 1673. The Court concluded its prior decisions applied the per se standard to "noncompetition agreements following the termination of employment or sale of interest in a business." (*Ixchel*, *supra*, 9 Cal.5th at p. 1159.) But it rejected the argument that "*Edwards* conclusively held that section 16600 invalidates all restraints on trade for all contracts, no matter how reasonable." (*Id*. at p. 1158.) Rather, the Court observed its past decisions had found contractual restraints on business operations and commercial dealings to be valid if reasonable. (*Id*. at p. 1153.) It affirmed these past decisions and held that "a reasonableness standard [applies] to contractual restraints on business operations and commercials dealings." (*Id*. at p. 1159.)

The Court also explained that it was "mindful of the consequences of strictly interpreting the language of section 16600 to invalidate all contracts that limit the freedom to engage in commercial dealing. '*Every* agreement concerning trade . . . restrains.' [Citation.] In certain circumstances, contractual limitations on the freedom to engage in commercial dealings can promote competition." (*Ixchel*, *supra*, 9 Cal.5th at p. 1160.) The Court noted the competitive benefits of exclusive dealing arrangements between businesses. (*Id*. at pp. 1160–1161.) After highlighting these potential benefits, the Court "decline[d] to construe section 16600 to" facially invalidate "such arrangements . . . simply because they restrain trade in some way." (*Id*. at p. 1161.)

Here, the arbitrator found the per se standard applied for two reasons. First, the noncompetition provision was "the product of the sale by [the Samuelians] of a substantial interest (but not the entire interest) they

19

held in the [Company] for more than $60 million. . . . The strict [(*i.e.*, per se)] application of § 16600 was specifically approved by both [*Ixchel*] and *Edwards* in cases of 'sale of an interest in a business.'" "[T]he transaction resulting in the [noncompetition provision] falls squarely within the long line of cases upholding strict application of § 16600's prohibition in sales of an interest in a business."

Second, the arbitrator believed section 16600 created a default standard of per se invalidity for contractual provisions that restrain anyone from "'engaging [in] a lawful profession, trade, or business of any kind.'" (Quoting § 16600.) And he read *Ixchel* as creating an exception to this general rule "for business-to-business contracts that should actually <u>promote</u> competition and the smooth flow of business and industry." He concluded the noncompetition provision completely restrained the Samuelians from pursuing lawful employment or operating a business of their choice within California and failed to promote competition. Thus, he concluded this case was closer to the facts of *Edwards* than *Ixchel* and applied the per se standard.

On appeal, the Company acknowledges *Ixchel*'s statements that noncompetition agreements are invalid per se if they arise from the sale of a business interest. (*Ixchel*, *supra*, 9 Cal.5th at p. 1159.) But it contends the per se standard only applies if the restrained party sells its *entire* business interest and "does not apply to partial sales after which an individual retains a significant interest in a business." It claims the reasonableness standard applies in such cases.

20

We agree the reasonableness standard applies to partial sales.[8] We also find this case is closer to the facts of *Ixchel* than *Edwards*. As explained below, the seller remains an owner of a business following a partial sale and may hold some degree of control over its operations. Due to that ongoing connection, noncompetition agreements arising from a partial sale must be evaluated under the reasonableness standard to determine whether they have procompetitive benefits.

*C. The Applicable Standard*

We begin by determining the applicable standard for partial sales. Nothing in *Ixchel* or the cases cited therein hold that a noncompetition agreement is invalid per se if it arises from the partial sale of a business interest. *Ixchel* did not involve this issue. Rather, in surveying its prior opinions interpreting section 16600, the Supreme Court explained that "[o]ver time, our case law has generally invalidated agreements not to compete upon the termination of employment or upon the sale of interest in a business without inquiring into their reasonableness . . . ." (*Ixchel*, *supra*, 9 Cal.5th at p. 1151.) After reviewing these cases in detail, it determined they were still good law:  "We do not disturb the holding in *Edwards* and other decisions strictly interpreting section 16600 to invalidate noncompetition

_____

[8] To clarify, "partial sale" in this opinion refers to an owner's sale of a portion of his or her ownership interest in a company where the seller remains an owner following the sale. As used here, "partial sale" does not include the sale of an entire subdivision of a company, which might also be construed as a partial sale of a company. (See, e.g., *Martinez v. Martinez* (1953) 41 Cal.2d 704, 705-707 [noncompetition agreement following sale of San Diego branch of a business was valid under section 16601].)

21

agreements following the termination of employment or sale of interest in a business." (*Id.* at p. 1159)

However, all the relevant cases cited by *Ixchel* involved the sale of an *entire* business interest. (*Ixchel*, *supra*, 9 Cal.5th at pp. 1152–153, 1156 [discussing cases involving sale of a business interest]; *Chamberlain v. Augustine* (1916) 172 Cal. 285, 286-287 [defendant sold his interest in a foundry company] (*Chamberlain*); *Merchants' Ad-Sign Co. v. Sterling* (1899) 124 Cal. 429, 430-431 [defendant sold all his shares in a bill posting business (*Merchants' Ad-Sign*)]; *Gregory v. Spieker* (1895) 110 Cal. 150, 150-152 [defendant sold entire food business] (*Spieker*).)[9] None of these cases considered whether a partial sale would trigger the per se standard, nor are we aware of any such cases that *Ixchel* did not discuss.

Moreover, none of the above cases contain any analysis or express any public policy that would apply to the partial sale of a business interest. Rather, as noted by *Ixchel*, these cases contain sparse analysis. (See *Ixchel*, 9 Cal.5th at pp. 1152–1153.) For example, in *Merchants' Ad-Sign*, the Court simply concluded that "[t]he language of the Code is unmistakable:  'Every contract by which one [*i.e.*, any person] is restrained from exercising a lawful . . . business of any kind . . . is to that extent void.' The allegation is, that defendant agreed not to engage in the business of bill posting, which is a lawful business. This was an agreement in restraint of trade, and therefore

_____

[9] *Chamberlain* states the seller sold 60 shares of stock, but it does not state whether this was the seller's entire interest in the company or only a partial interest. (*Chamberlain, supra*, 172 Cal. at p. 286.) But the context of the case indicates it was the sale of an entire interest. The opinion explains the seller "desired to withdraw" from the company. (*Id.* at p. 286.) Further the sales agreement allowed the seller to work as a "molder or laborer" at other specified companies without violating the noncompetition agreement, indicating he had no further involvement with the company. (*Id.* at p. 287.)

22

void." (*Merchants' Ad-Sign, supra*, 124 Cal. at p. 434.) Likewise, the Court in *Chamberlain* observed that "[t]he [noncompetition] covenant in question clearly operates to restrain the defendant from 'exercising a lawful profession, trade, or business,' and as it does not fall within the exceptions given in section 1673, it is, therefore, void." (*Chamberlain, supra*, 172 Cal. at p. 288.)[10]

"'It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court.'" (*Ixchel, supra*, 9 Cal.5th at p. 1158; *Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343 ["A decision . . . does not stand for a proposition not considered by the court."].) With this in mind, *Ixchel* and the above cases only hold the per se standard applies to restraints arising from the sale of an entire business interest. None of these cases address whether noncompetition agreements arising from the partial sale of a business interest are invalid per se. Thus,

---

[10] In *Spieker*, the business sale included goodwill, so the noncompetition restriction was found partially valid under former Civil Code section 1674 (the predecessor to section 16601). (*Spieker, supra*, 110 Cal. at pp. 153–154.) The Court's analysis focused on defendant's breach of the valid portion of the noncompetition agreement and the measure of damages. (*Id.* at pp. 152–154.)

we must determine whether the per se or reasonableness standard applies to partial sales.[11]

We start by looking at the purpose behind section 16600: "[S]ection 16600 evinces a settled legislative policy in favor of open competition and employee mobility. [Citation.] The law protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.' [Citation.] It protects 'the important legal right of persons to engage in businesses and occupations of their choosing.'" (*Edwards, supra*, 44 Cal.4th at p. 946; *Quidel Corporation v. Superior Court of San Diego County, supra*, 57 Cal.App.5th at p. 166 ["'California courts have consistently declared [section 16600] an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice'"].)

As we read *Ixchel*, there are certain noncompetition agreements that are so antithetical to section 16600's purpose that they are invalid per se. For example, restraints following an employee's termination or the sale of an entire business interest (absent an applicable exception) unquestionably interfere with a person's right to engage in an occupation or business of their

---

[11] At oral argument on appeal, the Samuelians appeared to suggest that *Blue Mountain Enterprises, LLC. v. Owen* (2022) 74 Cal.App.5th 537, addresses the proper standard as to partial sales. Since they raised this case for the first time at oral argument, we did not allow them to discuss it. We also find it inapposite. *Blue Mountain* involved the formation of a joint venture where the seller transferred all of his ownership interest in his company to a new entity. The other party to the joint venture was then given a 50 percent interest in the new entity. (*Id.* at pp. 542–543.) The parties disputed whether the seller had sold his entire interest in the company or only half of it for purposes of section 16601. (*Id.* at pp. 550–552.) The court found the seller had sold his entire interest, as such, section 16601 applied. (*Id.* at pp. 553–554.) These issues are not pertinent to this case.

24

choosing. Thus, they are struck down without further analysis. (See *Ixchel*, *supra*, 9 Cal.5th at pp. 1152–1153, 1158.) Yet, there are also some noncompetition agreements whose effect on competition is unclear. Such agreements must be scrutinized more closely to determine their reasonableness. (See *id.* at pp. 1153–1156, 1160–1161.)

A noncompetition agreement arising from the partial sale of a business is not so obviously anticompetitive that it necessarily conflicts with section 16600's purpose. For example, while noncompetition restraints arising from the termination of employment are invalid per se, section 16600 "does not affect limitations on an employee's conduct or duties *while employed.* 'While California law does permit an employee to seek other employment and even to make some "preparations to compete" before resigning [citation], California law does not authorize an employee to transfer his loyalty to a competitor. During the term of employment, an employer is entitled to its employees' "undivided loyalty."'" (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 509, second italics added.)

"The public policy behind Section 16600 is to ensure 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice' [citation] and to encourage 'open competition and employee mobility' [citation]; it is not to immunize employees who undermine their employer by competing with it while still employed. 'We state the obvious in observing that no "firmly established principle of public policy" [citation] authorizes an employee to assist his employer's competitors.' [Citations.] It should be even more obvious that no firmly established principle of public policy authorizes an employee to become his employer's competitor while still employed. Section 16600 is not an invitation to employees to bite the hand

25

that feeds them." (*Techno Lite, Inc. v. Emcod, LLC* (2020) 44 Cal.App.5th 462, 473–474.)

An owner that sells their entire interest in a company is in a similar position to a terminated employee:  his or her connection to the business has been severed. But similar to current employees, owners that only sell a partial ownership interest remain owners of the company and may still have a significant connection to it. Following a partial sale, the selling owner could still be involved in operational decisions and/or receive confidential financial information about the company. Given these potential connections following a partial sale, a restriction barring the selling owner from competing with the company is not so inherently anticompetitive as to warrant application of the per se standard. Rather, such restrictions may have procompetitive benefits. For example, they could ensure that owners are invested in improving the company's products or services, motivated to optimize the company's resources to expand into related lines of business, and/or are not using private information to create or assist competing businesses, among other things.

Because of their potential procompetitive benefits, anticompetition restrictions following a partial sale require some scrutiny to determine whether they are reasonable in light of the seller's ongoing connection with the company. Such restrictions should be evaluated under the reasonableness standard to determine whether they are more harmful or helpful to competition by "considering '"the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption."'" (*Ixchel, supra,* 9 Cal.5th at p. 1150.)

Further, following a partial sale, selling owners may owe their company a duty of loyalty that prohibits them from competing with it. Adopting a per se standard to noncompetition restraints following partial sales would unnecessarily interfere with these fiduciary duties and erode a company's ability to ensure its owners make decisions that benefit the company.

As we explain in the next section, while the California Revised Uniform Limited Liability Company Act (the "RULLCA") does not impose fiduciary duties on members in a *manager*-managed company, as is the case here, it allows an operating agreement to impose such duties on members.[12]

Moreover, members in a *member*-managed company owe statutory fiduciary duties of loyalty and care to the company and other members under the RULLCA. (Corp. Code, § 17704.09, subd. (a).) The duty of loyalty includes "[t]o refrain from competing with the limited liability company in the conduct . . . of the limited liability company."[13] (Corp. Code, § 17704.09, subd. (b)(3).) While the duty of loyalty can be narrowed, it cannot be eliminated. (Corp. Code, § 17701.10, subd. (c)(4).) Thus, following a partial sale in a member-managed company, the seller would remain a member of the company and be bound by the duty of loyalty. (Corp. Code, § 17704.09,

_____

[12] In *manager*-managed limited liability companies, the RULLCA imposes statutory fiduciary duties on managers but not members. (Corp. Code, § 17704.09, subd. (f).)

[13] The parties discuss whether we should apply the RULLCA or its predecessor, the Beverly-Killea Limited Liability Act (Beverly-Killea), to the operating agreement. (See *CB Richard Ellis, Inc. v. Terra Nostra Consultants* (2014) 230 Cal.App.4th 405, 411, fn. 4 [the RULLCA replaced Beverly-Killea].) We do not discuss Beverly-Killea because our concern is with the fiduciary duties generally imposed under existing law, not the specific fiduciary duties applicable to the Samuelians.

subds. (a) & (b).) Section 16600 would not invalidate the selling member's statutory duty of loyalty in a member-managed company. (See *Angelica Textile Services, Inc. v. Park*, *supra*, 220 Cal.App.4th at p. 509; *Techno Lite, Inc. v. Emcod, LLC*, *supra*, 44 Cal.App.5th at pp. 473–474.)

We recognize that section 16600's application is limited to "every contract" that restrains competition. (§ 16600, subd. (a).) It does not appear to apply to the above statutory fiduciary duties imposed by the RULLCA on members unless those duties are set forth in the operating agreement or another contract. Accordingly, adoption of the per se standard to partial sales could create absurd results. Consider a scenario in which after a partial sale, the selling member signed a new operating agreement or other contract that simply reiterated its fiduciary duties under the RULLCA. Under the per se standard, this provision would seemingly be void without any analysis. (See *Ixchel*, *supra*, 9 Cal.5th at p. 1151 [per se standard invalidates noncompetition agreement "without inquiring into their reasonableness"].) It makes no sense that a statutorily imposed duty of loyalty would be valid if unstated in a contract but would be invalid if repeated in one. In contrast, under the reasonableness standard, a court could conclude the restraint was enforceable because it was mandated by the RULLCA.

We also note other potential conflicts between the RULLCA and section 16600 that could arise if we applied the per se standard to partial sales. The RULLCA allows an operating agreement to make some alterations to the duty of loyalty owed by members in a member-managed company. The duty of loyalty cannot be entirely eliminated (Corp. Code, § 17701.10, subd. (c)(4)), but an operating agreement can narrow it in two ways:  (1) "[i]dentify[ing] specific types or categories of activities that do not violate the duty of loyalty, if not manifestly unreasonable"; and/or (2) "[s]pecify[ing] the

28

number or percentage of members that may authorize or ratify, after full disclosure to all members of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty." (Corp. Code, § 17701.10, subd. (c)(14)(A) & (B).) Conversely, in a member-managed company, the operating agreement can expand the members' statutory duty of loyalty "in a written operating agreement with the informed consent of the members." (Corp. Code, § 17701.10, subd. (e); Soza, et al., Cal. Practice Guide: Pass—Through Entities (The Rutter Group 2023) ¶ 6:501, p. 61.)

Following a partial sale in a member-managed company, if a new operating agreement broadened the members' statutory duty of loyalty by adding noncompetition restraints, such restraints would be invalid per se even though they are permitted by the RULLCA. (Corp. Code, § 1170.10, subd. (e).) Or, if a new operating agreement sought to narrow the members' duty of loyalty in accordance with the RULLCA (Corp. Code, § 17701.10, subd. (c)(14)(A) & (B)), these modifications would also be invalid per se. (See *Chamberlain*, *supra*, 172 Cal. at pp. 287–289 [partial restraints are invalid per se].)

"'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions.'" (See *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.) To avoid potential conflicts between section 16600 and the RULLCA, we find the reasonableness standard applies to section 16600 when evaluating noncompetition agreements following partial sales. When applying this standard, courts can determine the reasonableness of any contractual fiduciary duties placed on a member in a manager-managed or member-managed company.

29

Next, as to the arbitrator's second ground, we find this case to be more similar to *Ixchel* than *Edwards* for the reasons set forth above. *Edwards* involved a noncompetition agreement arising from the termination of employment. Like a terminated employee, an owner that sells their *entire* interest in a company generally has no further connection or involvement with the company. However, where a partial sale occurs, the owner remains an owner of the company and may be involved with its operation. That ongoing connection separates a seller of a partial interest from a terminated employee. The scenario we face here is markedly different than *Edwards*.

This case shares more in common with the noncompetition restraints between businesses in *Ixchel* because there is an ongoing relationship between the Samuelians and the Company. As outlined above, the Samuelians still have some control over the Company. Due to this continued relationship, the noncompetition provision may have procompetitive effects unlike the case of a terminated employee. Given the control the Samuelians still possess over the Company, the restraints here require further scrutiny to determine whether they are reasonable.

As to prejudice, the trial court found any error in applying the per se standard was not prejudicial due to the arbitrator's finding in the Phase One that the noncompetition provision was unreasonable under section 16601. But, during the reconsideration motion hearing, the arbitrator clarified this prior statement was not a binding ruling. The arbitrator acknowledged he had made "rulings that prohibited [the Company] from putting on evidence that would have gone to the reasonableness issues." Thus, he clarified his prior statement that the noncompetition provision was unreasonable was "dictum." The arbitrator also stated that if *Ixchel* required

30

the reasonableness standard to be applied here, he would need to hold another hearing as to the provision's reasonableness.

Based on the above statements from the arbitrator, we find the error was prejudicial. There is more than an abstract possibility that the noncompetition provision could have been found to be enforceable had the arbitrator applied the reasonableness standard. (See *Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at p. 800.)

The arbitrator's ruling invalidating the corporate opportunities provision was based on the same legal analysis as the noncompetition provision. As such, this portion of the ruling is also erroneous and prejudicial for the reasons above. To the extent the Company argues the corporate opportunities provision should be treated differently than the noncompete provision, we disagree. The arbitrator found the two provisions were intertwined and could not be severed from each other. This is a factual finding that we lack authority to review.

D.  *Members' Fiduciary Duties in a Manager-Managed Company*

Both the arbitrator and the trial court found an operating agreement could not impose noncompetition restrictions on members in a *manager*-managed company. We disagree.

First, similar to the discussion above, nothing in section 16600's purpose suggests that any such noncompetition restrictions are invalid per se. The public policy behind section 16600 does not authorize employees to compete with their current employer. (*Techno Lite, Inc. v. Emcod, LLC*, *supra*, 44 Cal.App.5th at pp. 473–474.) Similarly, it should not make a company powerless to ensure its current owners do not open or assist competing businesses, so long as such restrictions are reasonable. As mentioned above, a member in a manager-managed limited liability may

31

have some control over the company's operations, as is the case here. In such scenarios, noncompetition restrictions could be enforceable if they have procompetitive effects. (Cf. *Ixchel, supra*, 9 Cal.5th at pp. 1160–1162.) It could be reasonable for a company to require its owners to refrain from certain competitive activities and ensure their focus is on growing and improving the company.

Here, for instance, the Samuelians' consent was required to (1) change the operating agreement, (2) make any split, combination, or reclassification of membership interests, (3) form certain agreement between the Company and an owner, owner's family member, or entity affiliated with an owner, (4) engage the Company in a new line of business, or (5) make changes to Mastrocola's terms of employment. The Company was also required to send the Samuelians private financial information. Given this level of involvement, it could have been reasonable to impose certain noncompetition restrictions on the Samuelians to eliminate conflicts of interest that could compromise their decisionmaking and ensure they were committed to the Company's success.

Second, nothing in the RULLCA bars an operating agreement from imposing reasonable noncompete restrictions on members in a manager-managed company. While the RULLCA does not affirmatively impose any such fiduciary duties, it is only intended to provide default rules where a company's operating agreement is silent. (Corp. Code, § 17701.10, subd. (b).) As treatises have explained, "The [RULLCA] is a 'default' statute—meaning that in the absence of agreement otherwise by the members of the LLC in the operating agreement . . . , the statute sets forth the rights, obligations and the duties of the members, managers (if any) and officers (if any) of the LLC to third parties and amongst themselves." (Olson, Cal. Bus. Law Deskbook

32

(2023) § 3:1; Gutterman, 3A Cal. Transactions Forms—Bus. Entities (2023) § 16:65 ["While the specific statutory language of the RULLCA provides many of the operational provisions for an LLC (referred to as the 'default' provisions), the members have broad latitude to change them in the operating agreement"].)

The RULLCA lists certain matters that "an operating agreement shall not do . . . ." (Corp. Code, §§ 17701.10, subds. (c) & (d).) For example, an operating agreement cannot eliminate the statutory fiduciary duties imposed on a member in a member-managed company or a manager in a manager-managed company. (Corp. Code, § 17701.10, subd. (c)(4), (14), (15).) But nothing in these subdivisions bars an operating agreement from imposing fiduciary duties on members in a manager-managed company. (See Corp. Code, § 17701.10, subds. (c) & (d).)

In reaching a different conclusion, the trial court relied on a portion of the RULLCA stating that "[t]he fiduciary duties of a manager to a manager-managed limited liability company . . . and of a member to a member-managed limited liability company . . . shall only be modified in a written operating agreement with the informed consent of the members." (Corp. Code, § 17701.10, subd. (e).) The court believed this subdivision, "*expressly limit[s] creation* of fiduciary duties." And it concluded that "[h]ere, there is no dispute that the Samuelians were minority members of a manager-managed LLC and thus had no fiduciary duties that could be 'modified.'"

The trial court read too much into Corporations Code section 17701.10, subdivision (e). It has a much narrower application. This subdivision only provides that *modifications* of fiduciary duties imposed on managers or members must be made in writing with informed consent. But

33

nothing in this subdivision prevents an operating agreement from *creating* fiduciary duties for members in a manager-managed company. Indeed, other provisions of the RULLCA allow for such duties to be imposed.

Corporations Code section 17704.09 sets forth the fiduciary duties of members in a member-managed company and managers in a managed-managed limited liability company. It creates a default rule in which members in a manager-managed company do not owe fiduciary duties to the company or other members. (Corp. Code, § 17704.09, subd. (f)(1)-(3).) But this default rule can be displaced. This section specifies that in manager-managed companies, "*[e]xcept as otherwise provided*, a member does not have any fiduciary duty to the limited liability company or to any other member solely by reason of being a member." (Corp. Code, § 17704.09, subd. (f)(3), italics added.)

The phrase "except as otherwise provided" suggests members in a manager-managed company can have fiduciary duties where "provided," such as if imposed by an operating agreement. The statute's text is broad enough to support this interpretation. Significantly, "[e]xcept as otherwise provided," is not qualified in Corporations Code section 17704.09, subdivision (f)(3). But the RULLCA expressly qualifies other exceptions. (See, e.g., Corp. Code, § 17701.10, subd. (a) ["Except as otherwise provided in this section"]; Corp. Code, § 17701.10, subd. (c)(11) ["Except as otherwise provided in subdivision (b) of Section 17701.12"]; Corp. Code, § 17701.10, subd. (c)(12) ["Except as provided therein, vary any provision under Article 10"]; Corp Code, § 17702.03, subd. (a)(1) ["Except as otherwise expressly provided in this title and in this subdivision"]; Corp Code, § 17704.07, subd. (c)(1) ["Except as otherwise expressly provided in this title"].)

34

If the Legislature intended for courts to narrowly interpret or otherwise limit the phrase "[e]xcept as otherwise provided," in Corporations Code section 17704.09, subd. (f)(3), it knew how to do so. Since it did not, we can infer this statement should be broadly interpreted and can be read to encompass operating agreements. Here, for example, it could be read to state that "[e]xcept as otherwise provided" in the operating agreement, "a member does not have any fiduciary duty to the limited liability company or to any other member solely by reason of being a member." (See Corp. Code, § 17704.09, subd. (f)(3).)

In sum, we conclude an operating agreement can impose fiduciary duties on members in a manager-managed company. If a noncompetition restriction is included in these fiduciary duties, it should be evaluated under the reasonableness standard.

E.  *The Samuelians' Arguments*

We do are not persuaded by any of the Samuelians' arguments opposing application of the reasonableness standard.

The Samuelians claim application of the reasonableness standard instead of the per se standard "would render the statutory scheme incoherent. Noncompete agreements arising from 'the sale of interest in a business' are generally *per se* invalid (*Ixchel*, [*supra*,] 9 Cal.5th at pp. 1151–1152, 1156, 1159), but agreements arising from the sale 'of *all* of [a party's] ownership interest in the business' are generally *valid* (Bus. & Prof. Code, § 16601, italics added). *Ixchel*'s holding makes sense only if sales of *some* of a party's interests trigger the rule of *per se* invalidity; otherwise, section 16601's statutory exception would make that holding a null set."

We disagree. As discussed above, section 16601 generally allows limited noncompetition agreements to be enforced following the sale of an

35

entire business interest. Prior to 1945, however, section 16601 (and its predecessor, former Civil Code section 1674) only allowed enforceable noncompetition agreements if the owner sold the goodwill of a business. (*Bosley Medical Group v. Abramson* (1984) 161 Cal.App.3d 284, 288–289.) The exception in section 16601 (and its predecessor) did not apply to the sale of an entire business interest unless the sale expressly included goodwill. (*Ibid.*; see, e.g., *Chamberlain*, *supra*, 172 Cal. at pp. 287–288.) This changed in 1945, when section 16601 was amended to allow valid noncompetition agreements to be formed following the sale of an entire business interest that do not expressly include the business's goodwill. (*Bosley*, *supra*, at p. 289, italics omitted.)

Following this amendment, though, section 16601 still does not apply to all sales of an entire business interest. For section 16601 to apply, some goodwill must still be included in the sale. (*In re Marriage of Greaux & Mermin* (2014) 223 Cal.App.4th 1242, 1251.) For example, "there must be a clear indication that in the sales transaction, the parties valued or considered goodwill as a component of the sales price, and thus the share purchasers were entitled to protect themselves from 'competition from the seller which competition would have the effect of reducing the value of the property right that was acquired.'" (*Hill Medical Corp. v. Wycoff* (2001) 86 Cal.App.4th 895, 903.) Likewise, the noncompetition restraint is only valid "in situations in which the transfer of 'all' of the owner's shares involves a substantial interest in the corporation so that the owner, in transferring 'all' of his shares, can be said to transfer the goodwill of the corporation." (*Bosley Medical Group v. Abramson*, *supra*, 161 Cal.App.3d at p. 290.)

Our holding would not nullify *Ixchel*'s statement that noncompetition restraints following the sale of a business interest are invalid

36

per se. Noncompetition restraints following the sale of an entire business interest are still invalid per se if they do not include any goodwill, e.g., where the seller did not own a "substantial interest" in the company or where goodwill was not considered in the sales price. For example, a restraint arising from an owner's sale of its entire one percent interest in a company would likely not meet the requirements of section 16601 and would be invalid per se. (See, e.g., *Hill Medical Corp. v. Wycoff*, *supra*, 86 Cal.App.4th at pp. 907–908 [sale of seven percent interest "did not involve a substantial interest such that it could be said that the transfer of goodwill was considered" in the sale].)

The Samuelians also highlight the trial court's finding that "the record . . . reflects that [Section 6.4] arose in connection with the termination of employment. But the arbitrator never made this factual finding. Indeed, his order denying the reconsideration motion concluded, this "is not an employment contract case . . . involving an employee." None of the parties claim the court had authority to review the arbitrator's factual findings. And we will not make that argument for them. (See *City of Riverside v. Horspool*, *supra*, 223 Cal.App.4th at p. 679, fn. 8.)

F. *Attorney Fees and Costs*

Due to our findings above, we also vacate the arbitrator's award of attorney fees and costs to the Samuelians.

37

## DISPOSITION

The judgment is reversed. The superior court is directed to enter an order denying the Samuelians' petition to confirm the award and granting the Company's motion to vacate the entire award, including the portion awarding attorney fees and costs. Defendants are entitled to their costs on appeal.

MOORE, ACTING P. J.

WE CONCUR:

GOETHALS, J.

SANCHEZ, J.